**In the Interest of S—— G. G——, et al.**

**No. 16090.**

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 26, 1989.

James L. Thomas, Waynesville, for appellant.

Wayne Gifford, Waynesville, for respondent deputy juvenile officer.

Ralph W. Muxlow II, Richland, for intervenors Rebecca and James J____.

CROW, Presiding Judge.

Mary G____ ("Mary") appeals from an order terminating her parental rights to S____ G. G____, a female born August 20, 1976; J____ G____, a female born May 8, 1979; M____ G____, a male born May 18, 1982; and T____ G____, a female born March 29, 1985.[1] Termination was predicated on a finding that Mary had, for a period of more than six months prior to the filing of the petition for termination, abandoned the children as defined in § 211.447.2(1)(b), RSMo 1986, in that Mary, without good cause, left the children without any provision for parental support and without making arrangements to visit or communicate with them, although able to do so.

Mary also complains in this appeal that the trial court erred in allowing the foster parents of the two youngest children to remove them to Germany where the foster father had been assigned by military orders.

Inasmuch as one of Mary's contentions on appeal is that the evidence was insufficient to support the finding of abandonment, a comprehensive account of the evidence is necessary. The evidence was presented at a hearing November 2, 1988. Mary was represented by counsel at the hearing but she did not attend, as detailed *infra.*

The evidence revealed that on December 2, 1987, with Mary's consent, caseworkers of the Division of Family Services ("DFS") picked up the four children at a residence in Pulaski County where the children had been living with Mary and one Fred W____. Other caseworkers transported Mary to the "stress center" at Phelps County Regional Medical Center in Rolla.

The next day a deputy juvenile officer filed a petition in the juvenile division of the Circuit Court of Pulaski County praying the court to take jurisdiction of the children per § 211.031.1(1)(b), RSMo 1986, as the children were without proper care, custody or support. The petition alleged Mary had signed a consent to voluntarily place the children in foster care to protect them from a potentially dangerous situation. The petition continued: "[Mary] is, fleeing from a man who has emotionally

1. The order contained a finding that H____ L____ G____ was the father of the three eldest children, and that V____ G____ was the father of the youngest child. The order terminated the rights of both fathers to their respective offspring. Neither father has appealed.

and physically abused her. She is planning to admit herself into the Phelps County Stress Center to receive counseling and guidance."

A document bearing Mary's signature was filed with the court. The document stated, among other things, that Mary wanted to place the children in the care of the State, that she was unable to care for them at that time and believed it was in their best interest that they be placed in foster care, that she understood that placing them in foster care meant that the juvenile officer or caseworker must receive an order from a judge, that once the order was signed the children became wards of the court and were no longer in her legal custody, that in order to have the children returned to her at a later date she would cooperate with any written service agreement developed between her and DFS, and that she understood she might be asked to support the children while they were not in her care.

The day the petition was filed (December 3, 1987) the court entered an order placing the children in the custody of DFS, which in turn placed the two eldest children in the foster home of Donna C___ ("Donna") and her husband, and the two youngest children in the foster home of Rebecca J___ ("Rebecca") and her husband, a member of the United States Army.

On December 12, 1987, Donna and Rebecca took the four children to visit Mary at the hospital in Rolla. A day or two later Rebecca went to North Carolina, where her father was terminally ill, taking the two youngest children with her.

On December 24, 1987, Victoria Trump, a DFS caseworker, took the two eldest children to visit Mary at the hospital in Rolla. The next day (Christmas) Mary had a "pass" from the hospital. She went to Donna's home and visited the two eldest children "approximately one hour." The two youngest children were still in North Carolina with Rebecca.

Mary was discharged from the hospital December 29, 1987. Caseworker Trump brought Mary back to Pulaski County to pick up her belongings, then returned her to Rolla. Trump testified Mary stated she was going to either St. Louis or Springfield, Missouri. Trump added: "I gave her my business card, told her it was most important to keep in contact with me to let me know where she was...."

On December 31, 1987, Mary appeared at the Salvation Army shelter in Jefferson City and told Ann Ward of that agency that the Salvation Army in Rolla had referred her. Mary remained in the shelter until January 6, 1988, during which time she became acquainted with Alice MacNaughton, another resident. Ms. MacNaughton testified that on January 6 she took Mary to the bus station so Mary could go to Tennessee to get her "LPN" license. Ms. Ward's testimony confirmed that Mary left the shelter January 6 to go to Tennessee.

In February, 1988, a friend of Mary's in Rolla gave caseworker Trump a letter the friend had received from Mary. The letter was postmarked February 3 at Chattanooga, Tennessee, and bore no return address. The back of the envelope carried this message: "Will you please mail this to Vicki at Family Services." This was the first time Trump had heard from Mary since December 29.

Ms. MacNaughton testified that on February 5, 1988, Mary returned to Jefferson City from Tennessee and moved into an apartment occupied by MacNaughton and the latter's son. MacNaughton recalled Mary obtained employment a week and a half later at a restaurant; the job lasted "about three weeks." MacNaughton encouraged Mary to save her tips so she would have money for an application to transfer her LPN license to Missouri and "get her pictures taken."

According to MacNaughton, a week or so after Mary's restaurant employment ended Mary obtained a part-time job "doing some cleaning for a church." Mary held this job until she received a "temporary" LPN license. Mary then obtained employment at Still Hospital at a starting salary "a little over $6 an hour." MacNaughton recalled that about this time she, her son, and Mary moved into a "convenience apartment" on Madison Street in Jefferson City.

Caseworker Trump testified that on Sunday, March 13, 1988, Donna informed Trump by phone that Mary was "in town" asking to visit the two eldest children. Mary, at Donna's request, telephoned Trump. This was the first Trump had heard of Mary since the letter from Chattanooga. Trump quoted Mary as saying she was starting the "orientation program" at Still Hospital the next day. Trump told Mary that visits with the children had to be set up through Trump.

Donna allowed Mary to visit the two eldest children at Donna's home March 13. Donna testified she (Donna) helped Mary call Rebecca's home so Mary could talk to the two youngest children even though Mary "didn't want to."

Ms. MacNaughton testified that Mary quit at Still Hospital after approximately two weeks. MacNaughton quoted Mary as saying she wanted night shifts but the Hospital informed her she had to have a month of "orientation" on days before she could have nights. A few days later Mary obtained a waitress job at a motel restaurant, but quit after four nights for the stated reason she "was getting some sexual harassment."

MacNaughton recalled that "the first couple of days of April," 1988, Mary "moved in with a boyfriend," Don B____, who was residing in the basement of a house occupied by "a couple that he knew." Mary left her belongings in MacNaughton's apartment. In "the middle part of April," said MacNaughton, Mary got a job as a cook in a "retirement home" in Jefferson City.

On April 20, 1988, in Cole County, Mary signed a document wherein she waived her appearance at the adjudication hearing in the § 211.031 proceeding initiated by the deputy juvenile officer December 3, 1987. The document stated Mary agreed to the disposition recommended by that official.

Ms. MacNaughton testified that around 11:00 p.m., May 22, 1988, Mary asked MacNaughton to drive Mary to Waynesville the next day for the adjudication hearing. MacNaughton responded she was unable to do so.

On May 23, 1988, the trial court conducted the adjudication hearing. Mary was not there. At the conclusion of the hearing the trial court entered an order finding that placement of the children in their home would be contrary to their welfare, consequently they were to remain wards of the court in the care and custody of DFS in foster care until further order.

Caseworker Trump testified she met Mary in Jefferson City May 23, 1988, to ask Mary "her intentions for her children." Trump informed Mary the State was going to seek termination of her parental rights. At Mary's request a visit was scheduled by Trump for Mary with all four children May 25. The one-hour visit took place as scheduled. This was the first time Mary had seen the two youngest children since December 12, 1987.

A document signed by Mary and Trump May 25, 1988, established a visiting schedule for June. One visit was scheduled each week, on Tuesday from 4:00 to 5:00 p.m., at the Pulaski County office of DFS.

Ms. MacNaughton testified she vacated the apartment on Madison Street in Jefferson City "the first of June," 1988, and had the utilities cut off, as they were all in her name. At that time, according to MacNaughton, Mary was still living with her boyfriend. MacNaughton recounted that Mary asked MacNaughton not to give up the apartment, as she (Mary) and her boyfriend wanted to move into it. MacNaughton added: "And so that is what they did. They ... took over the apartment." Asked whether Mary ever contributed anything to the rent or utilities while she lived with MacNaughton, MacNaughton answered: "No, sir, she did not."

Mary visited all four children as scheduled June 7. On that date Mary and caseworker Trump signed a "90–Day Written Service Agreement" wherein Mary and DFS agreed to certain conditions pertinent to Mary's stated goal of having the four children returned to her.

On the same day (June 7) Rebecca and her husband filed a motion to intervene in the § 211.031 proceeding, averring they

had filed a petition to adopt the two youngest children.

Mary visited all four children as scheduled June 14. On that date the deputy juvenile officer and caseworker Trump met with Mary; the deputy juvenile officer asked Mary to sign a consent to the termination of her parental rights. Mary refused. That same day the deputy juvenile officer filed a petition to terminate Mary's parental rights to the four children. It carried the same case number as the § 211.031 proceeding, and the two actions appear to have been treated thereafter as one case. No error is assigned about that in this appeal and we decline to consider the matter *sua sponte.*

Martha Roberts, a DFS caseworker in Jefferson City, testified Mary was discharged from employment by the retirement home "around June 17" because she did not appear for work as scheduled and failed to call.

On June 17, 1988, the trial court granted the motion of Rebecca and her husband to intervene. That same day Rebecca and her husband filed a motion for permission to remove the two youngest children from Missouri. The motion averred that Rebecca's husband was scheduled to be assigned to Germany in the summer of 1988, that Rebecca planned to be temporarily located in North Carolina, and that she would ultimately go to Germany when transportation and housing were authorized. The trial court held a hearing on the motion the day it was filed. Mary appeared in person, without counsel. The trial court entered an order allowing the two youngest children to go to North Carolina on a temporary basis but barring their removal from the United States. Rebecca left Missouri the next day (June 18) with the two youngest children.

Mary visited the two eldest children June 21 as scheduled. On June 28 the two eldest children waited 30 minutes at the DFS office but Mary did not appear. At 4:45 p.m., after the children had departed, Mary arrived. She phoned Donna's home asking to talk to the two eldest children; Donna denied the request.

Mary visited the two eldest children July 5 as scheduled.

Caseworker Roberts testified she went to Mary's apartment on Madison Street in Jefferson City in July. A man there told her Mary was gone. He did not identify himself.

Mary visited the two eldest children July 12. Whether she appeared for the remaining two scheduled visits in July is unclear from Trump's testimony, which disclosed only that there were "several" visits in July.

A visit with the two eldest children was scheduled August 5 at the DFS office. Mary failed to appear or call.

On August 12, 1988, Mary arrived late for a scheduled visit with the two eldest children at the DFS office. She was able to visit them 15 minutes.

On August 18, 1988, Mary filed a motion in the trial court praying for an order directing DFS to return the two youngest children to Pulaski County so Mary could exercise visitation with them. The following day Mary visited the two eldest children at the DFS office as scheduled.

Caseworker Roberts testified she saw Mary at the Madison Street apartment in Jefferson City August 24 but Mary would not allow Roberts inside, saying the apartment was "filthy." Roberts quoted Mary as denying she had a boyfriend and denying she was going to get married.

Mary visited the two eldest children as scheduled August 26.

Caseworker Trump testified Mary was evicted from the Madison Street apartment in August, and Mary never advised Trump as to her whereabouts thereafter.

Ms. Ward testified Mary appeared at the Salvation Army shelter in Jefferson City on September 2, 1988, and was given lodging. Mary visited the two eldest children at the Pulaski County DFS office that date, and visited them there again September 7. She failed to appear for a scheduled visit September 12.

Ms. Ward testified Mary was evicted from the Salvation Army shelter Septem-

ber 16 because she would not look for a job.

Mary returned to the shelter three days later, telling Ms. Ward she (Mary) was getting married to Don B___ the ensuing Friday (September 23). Ms. Ward asked Don B___, who was staying at the shelter at that time, about the marriage. B___, according to Ms. Ward, said there were no plans for marriage "in the near future." Ms. Ward, at the insistence of a minister, readmitted Mary to the shelter. Shortly thereafter Mary "got a job at Burger King."

On September 21, 1988, the trial court set the termination proceeding for trial November 2, 1988.

On September 23, 1988, Mary visited the two eldest children as scheduled. This was the last scheduled visit, as DFS implemented a policy of no parental visitation during the pendency of a proceeding to terminate parental rights unless authorized by court order.

On October 13, 1988, Rebecca and her husband moved the trial court for an order authorizing them to remove the two youngest children to Germany. The motion averred Rebecca's husband was there pursuant to military orders.

Ms. Ward testified that on October 22, 1988, Mary left the Salvation Army shelter to "move in" with Don B___.

Trial on the petition to terminate parental rights began November 2, 1988. The deputy juvenile officer was present in person and with counsel. Rebecca, who had driven to Waynesville from North Carolina with the two youngest children, was present in person and with the lawyer representing her and her husband. A lawyer previously appointed guardian ad litem for the four children was present. Mary's lawyer, James L. Thomas, was present but Mary was not.

At the outset lawyer Thomas filed a written request for a continuance, averring he was informed by Don B___ at 6:45 p.m., November 1, that Mary had been taken to the emergency room of a hospital in Jefferson City and had been admitted to the hospital by Dr. Miller "because of chest pains." The motion further alleged that Mary was the "major witness" in the case and without her Thomas would be unable to adequately represent her.

The lawyer for the deputy juvenile officer objected to a continuance as the trial setting had been made six weeks earlier and all witnesses for the deputy juvenile officer were present including three from Jefferson City: Ms. MacNaughton, Ms. Ward and caseworker Roberts. The lawyer added that he had served interrogatories on Mary August 22, 1988, and she had failed to answer them. The lawyer stated even if Mary appeared he would ask the court to bar Mary from testifying as to any matter covered by the interrogatories.

The lawyer for Rebecca and her husband joined in the objection, emphasizing Rebecca had come from North Carolina to testify. The lawyer added that the motion of Rebecca and her husband to remove the two youngest children to Germany had been noticed up for hearing that date, that quarters were available in Germany for Rebecca and the two youngest children, and that Rebecca was awaiting court permission to take the children there.

The trial court immediately contacted Dr. Miller by telephone, after which the trial court dictated the following statement into the record:

"[Dr. Miller] advised me that [Mary] was hospitalized yesterday but that it was not a life-threatening situation. He also advised me that she was dismissed by him approximately eight o'clock this morning and he didn't think she had left the hospital, but that was her decision. It was not his, that there's no reason for her to be there.... He indicated to her that he had told her even prior to the time she was dismissed this morning that she could go to court. There was no reason she should be absent from Court. She had the medical ability—physical ability to appear."

The trial court noted it was approximately 75 miles from Jefferson City to the court site in Waynesville and the time was then 10:18 a.m. The trial court denied the re-

quest of Mary's lawyer for a continuance, whereupon trial commenced.

■ The first of Mary's eight assignments of error on appeal is that the trial court erred in denying her request for a continuance. As we are compelled to reverse the trial court's termination of Mary's parental rights as henceforth explained in our discussion of Mary's fifth point, we could ordinarily bypass her first point. However, at the trial November 2, 1988, the trial court also heard the motion of Rebecca and her husband to remove the two youngest children to Germany, and on November 22, 1988, the trial court entered an order granting that motion. As one of Mary's complaints on appeal is that the trial court erred in doing so, we are obliged to consider Mary's complaint about the trial court's failure to grant a continuance, along with Mary's second, third and fourth points, each of which alleges error in the conduct of the trial.

■ The denial of a request for a continuance rarely is reversible error; yet, the trial court enjoys neither an absolute nor an arbitrary discretion, and the trial court's action will be reversed if there has been an abuse of discretion. *Missouri Public Service Co. v. Argenbright*, 457 S.W.2d 777, 785[10] (Mo.1970). In *Argenbright*, the only case relied on by Mary in support of her first point, a utility company seeking a transmission line easement was compelled by the trial court to amend its petition during trial, whereupon the utility company requested a continuance to enable it to consider the effect of the amendment and to consult its engineers to determine whether the easement could be scaled down. *Id.* at 785. The trial court denied the request. The Supreme Court of Missouri held that because of the particular circumstances of the case the utility company's claim of surprise was valid, the amendment was substantial, and the failure to grant a continuance was prejudicially erroneous. *Id.*

No similar circumstances appear in the instant case. Here the parties had six weeks' advance notice of the trial date. The lawyer for the deputy juvenile officer had at least nine witnesses present, as he presented testimony from nine witnesses plus the deputy juvenile officer. One witness, Rebecca, had come from North Carolina; three others had come from Jefferson City. Additionally, Mary had failed to answer the deputy juvenile officer's interrogatories, which were comprehensive in scope. The lawyer for the deputy juvenile officer stated to the trial court that if Mary appeared and sought to testify, the lawyer would seek an order barring Mary from testifying on any subject covered by the interrogatories.

Most importantly, however, Dr. Miller informed the trial court on the morning of trial that he (Miller) had dismissed Mary from the hospital at approximately 8:00 a.m., that there was no reason for her to be in the hospital, and that there was no reason she should be absent from court. It was 10:18 a.m., when the trial court denied Mary's request for a continuance. Had Mary started to court when she was dismissed from the hospital two hours earlier she could have traveled the 75–mile distance and arrived at or near the start of the trial. She did not, however, appear anytime that day. While the time of adjournment does not appear in the record, the trial obviously took several hours as the transcript of the proceeding covers some 320 pages.

Based on the information from Dr. Miller the trial court could have reasonably believed Mary's absence was not because of illness but instead was an attempt by her to prevent the termination proceeding from going to trial.

A trial court has the right to control its docket and the progress of litigation. *Blessing v. Blessing*, 539 S.W.2d 699, 702[4] (Mo.App.1976). On the information available to the trial court at the time it denied Mary's request for a continuance, and mindful that all lawyers and witnesses were present and ready to proceed with a trial that had been scheduled six weeks earlier, we cannot convict the trial court of an abuse of discretion in denying Mary's request for continuance. *Blessing*, 539 S.W.2d at 703. Mary's first point is denied.

■ Her second point complains that the trial court erred in receiving in evidence "all of the records of the Division of Family Services as a whole, as business records."

Caseworker Trump brought five files with her to the trial, one on Mary and one on each child. Over Mary's objection the trial court admitted the files in evidence. Mary asserts this was error, as the files contained hearsay.

■ The record on appeal contains none of the files, and they have not been filed separately with us as exhibits. *See:* Rule 81.15.[2] It is the duty of an appellant to provide an appellate court a record containing everything necessary for the determination of questions presented to it. *Williams v. Dover*, 768 S.W.2d 194, 196 (Mo.App.1989); *Farmers and Merchants Ins. Co. v. Cologna*, 736 S.W.2d 559, 569[9] (Mo.App.1987); *Coulter v. Michelin Tire Corp.*, 622 S.W.2d 421, 437[34] (Mo.App. 1981), *cert. denied*, 456 U.S. 906, 102 S.Ct. 1752, 72 L.Ed.2d 162 (1982).

We cannot reverse a judgment for trial court error against an appellant unless we find the error materially affected the merits of the action. Rule 84.13(b). Error without prejudice is no ground for reversal. *Neavill v. Klemp*, 427 S.W.2d 446, 448[9] (Mo.1968). Without the records complained of by Mary in her second point we cannot determine whether anything in them materially affected the trial court's decision to allow Rebecca and her husband to remove the two youngest children to Germany. Mary's second point is denied.

■ Mary's third point concerns a ruling by the trial court during cross-examination of caseworker Trump by Mary's lawyer. He attempted to ask Trump about Mary's employment at the retirement home, a subject as to which Trump had testified on direct examination. The deputy juvenile officer's lawyer objected on the ground that among the interrogatories unanswered by Mary were questions regarding her employment. He argued that because of Mary's failure to answer them her lawyer should be barred from cross-examining Trump about Mary's employment. The trial court sustained the objection. Mary maintains the ruling was error.

Nowhere in the transcript do we find an offer of proof as to what Mary's lawyer expected to establish by cross-examining Trump about Mary's employment.

■ An assignment of error regarding the exclusion of testimony cannot be considered on appeal in the absence of a showing in the trial court of what the testimony would have been and that it was relevant and material. *Moore v. Parks*, 458 S.W.2d 344, 348[6] (Mo.1970); *Wilhelmsen v. Peck*, 743 S.W.2d 88, 95 (Mo.App.1987). A very narrow exception exists when there is a complete understanding, based on the record, of the excluded testimony, the objection is to a category of evidence rather than to specific testimony, and the record reveals the evidence would have helped its proponent. *Frank v. Environmental Sanitation Management, Inc.*, 687 S.W.2d 876, 883–84[14] (Mo. banc 1985); *Wilhelmsen*, 743 S.W.2d at 95. The exception is inapplicable here, as there is no understanding of the excluded testimony and the record does not reveal it would have helped Mary in regard to the trial court's decision to allow Rebecca and her husband to remove the two youngest children to Germany. Mary's third point is without merit.

■ Mary's fourth point avers the trial court erred in overruling her objection to the use by the deputy juvenile officer of two witnesses whose identities were not disclosed until October 28, 1988. In considering this point we note Mary misstates the record in that only one of the two testified: DFS caseworker Judy Hueppelsheuser. The other was not called by any party.

Caseworker Hueppelsheuser testified she "monitored" two visits between Mary and the two eldest children; Hueppelsheuser described an incident that occurred during one of them. The incident was also described by Donna. Hueppelsheuser's testimony added nothing to Donna's account. More importantly, however, we find noth-

---

**2.** Rule references are to Missouri Rules of Civil Procedure (20th ed. 1989).

ing in Hueppelsheuser's testimony pertinent to the trial court's decision to allow Rebecca and her husband to remove the two youngest children to Germany. Mary has thus shown no prejudice from Hueppelsheuser's testimony. Mary's fourth point is denied.

█ In her fifth point Mary insists the evidence was insufficient to support the trial court's finding of abandonment. Section 211.447.2, RSMo 1986, provides:

"The juvenile court may terminate the rights of a parent to a child upon a petition filed by the juvenile officer, if it finds that the termination is in the best interests of the child and when it appears by clear, cogent and convincing evidence that one or more of the following grounds for termination exist:

(1) The child has been abandoned. The court shall find that the child has been abandoned if, for a period of six months or longer for a child over one year of age or a period of sixty days or longer for a child under one year of age at the time of the filing of the petition:

. . . .

(b) The parent has without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so;

. . . ."

As all four children were over one year of age on the date the petition for termination of Mary's parental rights was filed (June 14, 1988) the pivotal issue is whether there was clear, cogent and convincing evidence that Mary, during a six-month period prior to that date, abandoned the children within the definition of § 211.447.2(1)(b). *In the Interest of M.B.A.*, 709 S.W.2d 941, 946 (Mo.App.1986).[3]

The children were in Mary's custody until she turned them over to DFS December 2, 1987, and there is no contention by the deputy juvenile officer or the intervenors (Rebecca and her husband) that there was

any evidence of abandonment by Mary prior to that date.

It is arguable that from December 2, 1987, until June 14, 1988, Mary, without good cause, made no provision for parental support. We need not, however, decide that question as we hold the evidence was insufficient to support a finding that Mary, for a six-month period preceding the filing of the petition for termination, failed to make arrangements to visit or communicate with the children, although able to do so. The statutory provision relied on by the trial court in terminating Mary's parental rights—§ 211.447.2(1)(b), quoted above—clearly requires a finding that for a six-month period the parent has, without good cause, left the child without any provision for parental support *and* without making arrangements to visit or communicate with the child, although able to do so.

Mary had visited all four children December 12, 1987, when they were taken by Donna and Rebecca to see Mary at the hospital in Rolla. Mary also saw the two eldest children December 24, 1987, at the hospital and she visited them again the next day at Donna's home. Mary could not visit the two youngest children December 24 or 25, as they had been taken to North Carolina by Rebecca. It is undisputed, of course, that after December 25, 1987, Mary made no arrangements to visit any of the children until March 13, 1988, when she appeared unexpectedly and asked to see the two eldest children at Donna's home. At Donna's urging, Mary phoned Rebecca's home and talked to the two youngest children.

Mary made no further effort to visit any of the children until May 23, 1988, when she was informed that the State was going to seek termination of her parental rights. On that date she requested caseworker Trump to arrange visitation, and a schedule was established. Mary appeared for the first three scheduled visits (May 25, June 7

---

**3.** As explained by *In re Adoption of W.B.L.*, 681 S.W.2d 452, 455[7] (Mo. banc 1984), whether there has been an abandonment requires an examination of the parent's intent, an inferred

fact, determined by considering all the evidence of the parent's conduct including that before and after the statutory period.

and June 14), the last visit occurring on the date the termination petition was filed.

In addition to the visits listed above there was testimony by caseworker Trump that Mary telephoned Donna's home January 3, 1988, March 13, 1988 (the date of the unexpected visit), April 16, 1988, May 8, 1988, and May 23, 1988. There was no evidence that Mary phoned Rebecca's home on any occasion other than March 13, 1988.

We are mindful of § 211.447.4, RSMo 1986, which provides that the court may attach little or no weight to infrequent visitations or communications. If one gives no weight to Mary's unexpected visit with the two eldest children March 13, 1988, there is a period of almost five months (December 26, 1987, to May 22, 1988) during which Mary made no arrangements to visit any of the children. Indeed, after December 12, 1987, Mary did not see the two youngest children until May 25, 1988, a period of over five months, and she talked with them only on March 13, 1988.

The pertinent statute, however, requires a six-month period during which the parent makes no arrangements to visit or communicate with the child. On May 23, 1988, Mary asked caseworker Trump to arrange visitation, and a schedule was prepared. Mary kept each of the three scheduled visits from that date until the termination petition was filed June 14, 1988. It is thus clearly established that Mary not only made arrangements to visit the children, she fully complied with the schedule arranged by DFS prior to the filing of the termination petition.

We cannot, therefore, hold that the evidence is sufficient to support a finding that Mary, for a full six-month period prior to the filing of the termination petition, left the children without making arrangements to visit or communicate with them.

The deputy juvenile officer argues the trial court was not required to find both a failure to support and a failure to communicate during the statutory six-month period, citing *In the Interest of P.E.B.*, 708 S.W.2d 315, 321 (Mo.App.1986). The deputy juvenile officer misreads that case. There termination was predicated on § 211.447.2(2)(d), RSMo Cum.Supp.1984, upon a finding that the parent had knowingly permitted repeated or continuous abuse to the child causing physical or mental injury. The parent argued the evidence did not support termination under a different provision, § 211.447.2(2)(b), RSMo Cum.Supp.1984, which pertained to neglect. The appellate court held that termination was authorized if one or more of the statutory grounds for termination existed.

As leaving the children without making arrangements to visit or communicate with them for a six-month period prior to the filing of the termination petition is one of the elements of abandonment as defined in § 211.447.2(1)(b), RSMo 1986, the evidence is insufficient to support termination of Mary's parental rights on that ground, and there is no contention that the evidence supported termination on any other ground. We are thus constrained to reverse the trial court's termination of Mary's parental rights to the four children.

■ Mary's sixth point concerns a motion she filed in the trial court December 16, 1988, a week after the trial court entered the order terminating parental rights. By that motion Mary requested the trial court to conduct a "supplemental hearing" to afford her an opportunity to testify and "answer the allegations lodged against her." The trial court denied the motion. Mary's sixth point avers that ruling was erroneous.

■ A trial court's decision on whether to allow a party to present further evidence after the evidence is closed is a matter of discretion, and a trial court will be reversed only upon a showing of abuse of that discretion. *Matter of Estate of Viviano*, 624 S.W.2d 130, 133[7] (Mo.App. 1981). Ordinarily when there is no inconvenience to the court nor unfair advantage to one of the parties it would be an abuse of discretion to refuse to permit the introduction of material evidence which might substantially affect the merits of the case. *Id.* at 133[8]; *Pride v. Lamberg*, 366 S.W.2d 441, 445 (Mo.1963).

In the instant case Mary waited six weeks after the trial—and a week after the trial court had entered the order terminating parental rights—before seeking leave to present her testimony. Why she delayed that long is unexplained in the motion. Furthermore there is no showing that she answered the deputy juvenile officer's interrogatories prior to asking for leave to appear and testify. Finally, it would have been a substantial inconvenience to the other parties, particularly Rebecca, to reopen the evidence. By the time Mary's motion was filed, Rebecca and the two youngest children may well have been in Germany, and allowing Mary to testify without Rebecca being available for possible rebuttal could have given Mary an unfair advantage.

Given these circumstances the trial court did not abuse its discretion in denying Mary's motion for a supplemental hearing. Mary's sixth point is without merit.

 Her seventh point charges the trial court with error in granting the motion of Rebecca and her husband to remove the two youngest children to Germany.

In considering the point we observe that the order complained of was ancillary to the § 211.031 proceeding wherein the two youngest children were placed in the foster care of Rebecca and her husband. The order was not a component of the termination proceeding. As noted earlier, however, both proceedings appear to have been treated as one case in the trial court. No issue is raised by any party to this appeal regarding the propriety of reviewing that order in this appeal. Inasmuch as we have determined, for reasons set forth *infra*, that the seventh point is without merit, we have chosen to dispose of it that way without addressing the issue of whether it could have been denied on procedural grounds.

Mary's complaint about the order allowing the two youngest children to be removed to Germany, as we comprehend it, is that this effectively terminated her parental rights to those children by placing them where she cannot visit them and where her only contact can be by mail or telephone.

At the time the trial court had to decide whether to allow Rebecca and her husband to remove the two youngest children to Germany, it was apparent from the evidence presented at trial that the conditions extant when Mary consigned the four children to DFS December 2, 1987, remained uncorrected. Mary had led a nomadic existence during the eleven months preceding trial, living in the Salvation Army shelter on at least three separate occasions, occupying two different apartments with Ms. MacNaughton and her child, and occupying the same apartment (and before that a basement) with Don B——. Mary's whereabouts from January 6, 1988, until February 5, 1988, are unknown, except that she was apparently in Chattanooga, Tennessee, sometime during that period. Her employment had been sporadic, and until she was told there would be an attempt to terminate her parental rights her efforts to maintain contact with the children had been negligible.

It is thus obvious that at time of trial all four children were going to have to remain wards of the court in foster care. The two youngest children were apparently thriving in the care of Rebecca and her husband. He was then in Germany per military orders. Quarters were available there for Rebecca and the two youngest children. Denying Rebecca permission to take the two youngest children to Germany would, in all likelihood, have meant she would have had to surrender them to DFS for placement in another foster home.

As recognized in *D.G.N. v. S.M.*, 691 S.W.2d 909, 914 (Mo. banc 1985), every day a child in its formative years is left in a stable parent-child relationship, natural or foster, the greater the potential for harm to the emotional well being of the child should it be necessary to order a change of custody.

In view of the alternatives available to the trial court when it entered its order allowing Rebecca and her husband to remove the two youngest children to Germany, we cannot convict the trial court of error on that decision. Mary's seventh point is denied.

Her final point avers the trial court failed to consider the factors listed in § 211.447.3, RSMo 1986, and failed to make findings regarding those factors. As that section pertains to termination of parental rights and we have already determined that the trial court's termination of Mary's parental rights must be reversed, we need not consider this point.

We are painfully aware that our holding leaves the fate of the children in limbo. Our reversal of the termination of Mary's parental rights does not mean the children should forthwith be returned to her, as we have no way of knowing what her present circumstances are or what her lifestyle has been during the year since trial.

Mary, now 43 years of age, together with the trial court and the public officials into whose care Mary delivered her children, face difficult decisions. The children have now been in foster care about 23 months, and as noted earlier each day in foster care increases the emotional trauma a child must suffer if custody is changed.

Mary is free, of course, to reconsider her refusal to consent to the termination of her parental rights, particularly as to the two youngest children whom Rebecca and her husband were, at time of trial, seeking to adopt. Additionally, our holding in this appeal is no bar to termination of Mary's parental rights if new grounds have arisen.

The trial court's order terminating parental rights [4] is affirmed in all respects except that segment which terminates Mary's parental rights to the four children, which is reversed. The trial court's order allowing Rebecca and her husband to remove the two youngest children to Germany is affirmed.

GREENE, J., and HOLSTEIN, Special Judge, concur.

---

4. Footnote 1, *supra.*