In the Interest of D_____
L_____ C_____.

D_____ L. C_____, Sr., Appellant,

v.

Donald W. NELSON, Chief Deputy Juvenile Officer, Judicial Circuit 25, Respondent.

No. 17576.

Missouri Court of Appeals, Southern District, Division One.

June 11, 1992.

Kathryn P. Taylor, St. Louis, for appellant.

Sidney T. Pearson, St. James, for respondent.

CROW, Judge.

Appellant, D_____ L. C_____, Sr., appeals from an order terminating his parental rights to his daughter, D_____ L_____ C_____ ("D_____"), born June 18, 1986. Because one of Appellant's four points relied on avers the evidence was insufficient to support termination, an account of the epic evidence is required.

In summarizing it, we are mindful that due regard is given the opportunity of the trial court to judge the credibility of the witnesses. *D.G.N. v. S.M.*, 691 S.W.2d 909, 912 (Mo. banc 1985). Where the evidence conflicts, we view it in the light most favorable to the trial court's order. *In Interest of M.E.W.*, 729 S.W.2d 194, 195–96[4] (Mo. banc 1987).

So viewed, the evidence establishes that Appellant (born January 17, 1959) fathered D_____ out of wedlock. When D_____ was born, her mother ("J_____"), age 25 at time of trial,[1] and Appellant were living with his mother ("E_____").

D_____ was J_____'s first child, but Appellant's second. Appellant had fathered a son, D_____ L. C_____, Jr. ("Jr."), in 1982. In 1983, Jr.'s mother and Appellant agreed that Appellant's mother,

---

**1.** Trial occurred February 1, 1991.

E_____, be appointed guardian of Jr. Since then, Jr. has lived with E_____.

After D_____ was born, Appellant and J_____ lived with E_____ some eight months. Then, J_____ departed, taking D_____ with her, and began living with another man, C_____ Y_____, in a household that included his mother and her husband.

The record is murky as to how long J_____ and D_____ lived with C_____ Y_____, but the period had to be relatively brief. J_____ and D_____ left C_____ Y_____ and went to the home of J_____'s mother. Then, sometime in the summer of 1987, J_____ and D_____ returned to Appellant. As best we can determine from the record, the trio lived in a trailer, not with E_____.

On December 20, 1987, J_____ left Appellant and returned to C_____ Y_____. However, this time J_____ did not take D_____ with her. Instead, D_____ was taken to Appellant's mother, E_____. J_____ testified Appellant took D_____ there; Appellant testified J_____ took D_____ there.

Appellant continued to reside in the trailer a couple of months after J_____ departed. Then, he lived at three different places with his "sister-in-law." According to Appellant, "[S]he got us kicked out of all three places." Then, said Appellant, he and she stayed in a tent at "[m]y mom's" a couple of months.

Meanwhile, E_____ had filed a petition to be appointed D_____'s guardian. The date of the commencement of that proceeding does not appear in the record,[2] but the transcript reveals that on March 7, 1988, a document bearing Appellant's signature was filed in the proceeding. The document stated Appellant had no legally ascertained parental rights with D_____ and would be "unsuitable" at that time to properly care for, maintain and educate her. The record does not reveal the outcome of that proceeding, but it was evidently unsuccessful.

On March 30, 1988, Appellant signed a document acknowledging paternity of D_____ and authorizing the Director of the Division of Child Support Enforcement ("DCSE") to establish paternity by administrative order per § 454.485, RSMo 1986.

In April, 1988, J_____ filed a habeas corpus action against E_____ seeking custody of D_____. J_____ was unsuccessful.

In July, 1988, Appellant was placed under supervision of the Missouri Board of Probation and Parole, having pled guilty to burglary, second degree.

J_____ brought a second habeas corpus action against E_____ in August, 1988. This time J_____ was victorious, regaining custody of D_____ on August 18, 1988. J_____, who was still living in the household of C_____ Y_____, took D_____ there.

In the "last part" of 1988, Appellant began living with a woman and her two daughters. One of the daughters, according to Appellant, was age 15. Appellant admitted having sexual intercourse with her. However, said Appellant, the girl's mother knew "what was going on." Appellant resided there a month, then moved "back to ... mom's."

On November 22, 1988, J_____ gave birth to her second child, a daughter, N_____ J_____ W_____ ("N_____"). J_____ identified C_____ Y_____ as N_____'s father.

On April 7, 1989, J_____ delivered D_____ and N_____ to the Division of Family Services ("DFS") because, in J_____'s words, "I was having a nervous breakdown." A petition was filed in the Juvenile Division of the Circuit Court of Phelps County ("the juvenile court") by a deputy juvenile officer. The petition averred both children were in need of the care and treatment of the juvenile court per § 211.031.1(1)(b), RSMo 1986, in that they were without proper care, custody or support. The petition named Appellant as

**2.** The trial court took judicial notice of the file in the guardianship proceeding, but the file has not been supplied us.

D_____'s father. Henceforth, we refer to the proceeding described in this paragraph as "the neglect case."

The children were immediately placed with foster parents, W_____ R_____ and her husband, J_____ R_____, and have remained with them ever since.

Appellant contacted DFS soon after D_____ and N_____ were delivered there by J_____. Lynn Krafczik, a DFS social worker, told Appellant he had "no legal standing" to obtain custody of D_____ because "he had never been legally determined to be the father." According to Ms. Krafczik, she informed Appellant, "[T]he regular policy was to establish paternity and then to request a home study be completed, as well as pay child support."

DFS did, however, allow Appellant to visit D_____ twice a month, beginning in May, 1989. The visits were at the DFS office, supervised by Ms. Krafczik.

On July 20, 1989, Appellant filed a petition in the Circuit Court of Phelps County seeking, among other relief, a determination that he was D_____'s father. The case was assigned number CV389–303CC.

On September 28, 1989, the juvenile court held a hearing in the neglect case and determined it had jurisdiction over D_____ and N_____ per § 211.031.1(1)(b). Appellant attended the hearing. The court ordered that the children remain in the legal custody of DFS.

Maggie Claypool, an official of DCSE in Jefferson City, testified Appellant and his mother (E_____) made an unscheduled appearance at her office January 3, 1990. Ms. Claypool recalled Appellant saying he had been told he must obtain "blood testing" to establish paternity, and he did not have the money for it (evidently $600). Appellant wanted DCSE to help him obtain the tests. DCSE arranged for the tests, per court order in CV389–303CC, and paid for them.

On January 19, 1990, DFS sent Appellant to David W. Bailey, a clinical psychologist, for evaluation. A test by Bailey produced a "composite score of 76, which is equiva-

lent to a slow learner or borderline intelligence." Bailey added, "His overall mental age was 13.7." Asked what is average for a person of Appellant's age and education, Bailey replied, "I'd say 16." According to Bailey, 93 percent of the population has a higher I.Q. than Appellant.

On April 23, 1990, the Circuit Court of Phelps County entered an order in CV389–303CC adjudicating Appellant the father of D_____ and ordering her birth certificate amended, if necessary, to conform to such finding.

In May, 1990, DFS formulated a "service plan" for Appellant. It required him to exercise his twice-a-month visitation, pay DFS $25 per month child support, maintain adequate housing and regular employment, and not associate with known felons. There was also a proviso that D_____ would not be returned to Appellant's custody if he "was living in a non-marital relationship."

On June 1, 1990, the Circuit Court of Phelps County terminated J_____'s parental rights to N_____. On July 26, 1990, the same court heard evidence on whether J_____'s parental rights to D_____ should be terminated.

In August, 1990, DFS formulated a second plan for Appellant containing the same requirements as the April plan.

On October 11, 1990, the Circuit Court of Phelps County entered an order terminating J_____'s parental rights to D_____, based on the evidence heard July 26, 1990.

On October 22, 1990, the Chief Deputy Juvenile Officer of Judicial Circuit 25 (Respondent in this appeal) filed a petition to terminate Appellant's parental rights to D_____. A first amended petition was filed November 2, 1990.

On December 24, 1990, Appellant married one A_____, a woman with three daughters, ages 11, 9 and 2.

At trial some five weeks later,[3] it was revealed that the foster parents with whom D_____ and her half-sister, N_____, had been living since April 7, 1989, had adopted

---

**3.** Footnote 1, *supra.*

N———.[4] The foster parents had an action pending (JU390–55A) to adopt D———.

DFS caseworker Krafczik testified Appellant made his first $25 child support payment to DFS on September 6, 1990, and had made five others since then. She conceded he had fully complied with all other conditions of both service plans.

At time of trial, Appellant had been residing at the same address for two years (he was living there before he married A———) and had held his job—earning $4.35 per hour at a fast food restaurant—since July 31, 1989.

The first point relied on that we address is point III, which reads:

> The trial court was without jurisdiction to terminate the parental rights of [Appellant] as there had been no prior adjudication of neglect or abuse against him.

■ Discussion of this point requires us to set forth the provisions of § 211.447, RSMo 1986, cited by Respondent in his first amended petition to terminate Appellant's parental rights. They appear below.[5]

Examination of the provisions of § 211.447 relied on by Respondent reveals they define three grounds for termination. For convenience, we refer to the ground in subsection "(1)" of subdivision "2" as "abandonment"; we refer to the ground in subsection "(2)" of subdivision "2" as "neglect"; we refer to the ground in subsection "(3)" of subdivision "2" as "failure to rectify."

As noted earlier, the petition in the neglect case averred D——— and her half-sister, N———, were within the jurisdiction of the juvenile court by reason of § 211.031.1(1)(b), RSMo 1986, in that they were without proper care, custody or support. The petition pled J——— had no place to care for the children, had no known relatives or friends to care for them, and, because of her emotional state, J——— could injure the children if they remained with her.

Appellant begins his argument under point III by reminding us the petition in the neglect case did not aver any neglect or parental dereliction by him. Appellant asserts, "Nowhere are there any allegations ... against [Appellant], although his identity was known and disclosed in the petition." Appellant maintains natural parents

---

4. It appears from the record supplied us that the parental rights of C——— Y——— to N——— were terminated September 26, 1990.

5. Respondent's first amended petition cited these provisions of § 211.447, RSMo 1986:

> . . . .
> 2. The juvenile court may terminate the rights of a parent to a child upon a petition filed by the juvenile officer, if it finds that the termination is in the best interests of the child and when it appears by clear, cogent and convincing evidence that one or more of the following grounds for termination exist:
> (1) The child has been abandoned. The court shall find that the child has been abandoned if, for a period of six months or longer for a child over one year of age ... at the time of the filing of the petition:
> . . . .
> (b) The parent has without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so;
> (2) The child has been adjudicated to have been abused or neglected. In determining whether to terminate parental rights under this subdivision, the court shall consider and

make findings on the following conditions or acts of the parent:
> . . . .
> (d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for his physical, mental, or emotional health and development;
> (3) The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. . . .

Section 211.447, RSMo 1986, was repealed effective August 28, 1990, and replaced by a new section bearing the same number. Laws of Missouri 1990, H.B. 1370, et al., pp. 1108–29. In all respects material here, the 1990 version is identical to the 1986 version.

are clothed with a presumption of fitness as the custodians of their minor children, and this presumption automatically shifted to him when J_____ relinquished custody of D_____ to DFS. The juvenile authorities, says Appellant, made no attempt to overcome such presumption in the neglect case.

Appellant's theory, as he articulates it, is: "[I]f termination is sought against a parent who is not the parent who earlier had been found to be ... neglectful, then the Order conferring jurisdiction and divesting custody from him must contain findings that said parent is either unavailable, unwilling or unable to care for the child."

Appellant cites one case in support of point III, *In Interest of A.H.*, 662 S.W.2d 317 (Mo.App.1983). There, the mother of two children had been awarded custody of them at the time her marriage to their natural father was dissolved. Later, the mother asked the juvenile court to relieve her of custody because she suffered from a nervous condition and feared she would harm the children. At the dispositional hearing, the father sought custody. However, the children were placed with DFS. On appeal by the father, the Eastern District of this Court held the father was entitled to a presumption of fitness, and the juvenile court should have made specific findings on that issue. *Id.* at 319–20. The father should be denied custody only if unfit or if special circumstances exist demonstrating that placement of the children with him would be adverse to their best interests. *Id.* at 320.

Here, Appellant was never married to D_____'s mother (J_____), and there is no showing that any circumstances existed at the time of the dispositional hearing in the neglect case which would have given rise to a presumption under § 210.822, RSMo Supp.1987, that Appellant was D_____'s natural father.

Appellant cites no authority, and we know of none, permitting a man to appear at a dispositional hearing in a neglect case, declare himself the child's father, and,

without any further showing of paternity, claim custody.

■ We are mindful the petition in the neglect case named Appellant as D_____'s natural father and summons was served on him. This afforded him an opportunity to appear in the neglect case and present whatever claim he had for custody. However, the record fails to show he made any such effort.[6] It reveals only that he appeared. Because there is no showing that Appellant established he was D_____'s father in the neglect case (and therefore a possible custodial candidate), we find nothing amiss in the failure of the juvenile court to make findings in that proceeding regarding Appellant's availability, willingness or capability to care for D_____.

■ Furthermore, the ground of neglect as a basis for terminating parental rights is established by showing the *child* has been adjudicated neglected, not by showing the *parent* has been adjudicated neglectful. When the ground for termination is a neglect adjudication, the trial court is required to consider and make findings on the conditions or acts of the parent specified in paragraphs "(a)" through "(d)" of § 211.447.2(2). This affords the parent an opportunity to demonstrate that his character, parenting skills and circumstances are such that termination of his parental rights would not be in the child's best interests, even though the child has been adjudicated neglected. In its order terminating Appellant's parental rights, the trial court made findings on those subjects, some of which appear later in this opinion.

■ Appellant's argument would require us to engraft on § 211.447.2(2) a proviso that a parent's parental rights cannot be terminated where his child has been adjudicated to have been neglected unless, in the neglect proceeding, the parent was adjudicated responsible for the condition of neglect. A court may not engraft upon a statute provisions which do not appear in explicit words or by implication from other words in the statute. *Metro Auto Auction*

---

**6.** The record supplied us contains no transcript       of any hearing in the neglect case.

*v. Director of Revenue,* 707 S.W.2d 397, 402[8] (Mo. banc 1986). No such proviso appears in explicit words or by implication in the statute here.

Appellant's point III, while ingenious, is without merit. It is denied.

We next address point I, which reads:

The intervention-in-fact of the foster parents in the direct conduct of the termination proceedings violated [Appellant's] due process rights to a fair and impartial hearing.

    A. The Missouri Courts have universally held that direct foster parent intervention in termination proceedings can so taint the proceedings as to require reversal.

    B. The addition of § 211.464 to the Revised Statutes of Missouri does not authorize direct participation by foster parents in the fault-finding phase of termination proceedings.

■ Prior to trial, Appellant filed a motion in limine stating, in pertinent part:

... [Appellant] ... moves this ... Court to enter [its] Order ... preventing, excluding and restraining the foster parents ... or their legal representative, from interfering, intervening, or actively participating in any manner in the conduct of these termination proceedings. In support of this Motion, [Appellant] states ...

1. The Supreme Court of Missouri has clearly stated that foster parents, either directly or indirectly, have no legal standing to intervene or actively participate in termination proceedings concerning the natural parents of children in their custody. *Matter of Trapp,* 593 S.W.2d [193] (Mo.1980). Any claimed right to physical custody of children does not confer a right to litigate the issues of neglect or fitness of the natural parents.

2. Foster parents are not "parties" to the proceedings as such as they have no right to appeal from the judgment in the proceedings.

3. The stated policy for this exclusion is that the presence of the foster parents would tend to interject the false issue of their fitness to have custody of the children into the proceedings when the sole issue is the present fitness of the natural parent(s). Their active participation would therefore be unfair and against public policy. The test for termination, according to the Legislature, is not whether the children would be better off with someone else.

4. Active participation by foster parents in the conduct of termination proceedings can taint the proceedings so as to require reversal. Entry of appearance by counsel on behalf of the foster parents or counseling the Juvenile Officer is strictly prohibited and patently improper....

At the start of the trial, lawyer William E. Hickle, who represents the foster parents in their proceeding to adopt D_____ (JU390–55A), appeared in the trial court, along with the lawyer for Appellant, the lawyer for Respondent, and the guardian ad litem for D_____.

The trial court took up Appellant's motion in limine, and asked lawyer Hickle whether the foster parents had attempted to intervene in the termination case. Hickle replied, "No, Your Honor." The trial court then said:

The Court will not rule on that portion of the motion in limine until such a request is made. And if and when a motion to intervene or petition to intervene is presented to the Court, I'll rule on it at that time.

As to the active participation by foster parents in the conduct of the proceeding, that is, the presentation of evidence and the right to have counsel present, the Court will overrule that portion of the motion in limine.

Trial commenced with Respondent presenting his first witness. After cross-examination of the witness by Appellant's lawyer and the guardian ad litem, lawyer Hickle undertook to cross-examine. Appellant objected, asserting, "[T]his is direct participation by counsel for the foster parents in this proceeding." The trial court overruled the objection, whereupon Hickle

conducted a cross-examination consuming the next 21 pages of the transcript.

Respondent's second witness was Appellant. After Appellant was cross-examined by his own lawyer and the guardian ad litem, lawyer Hickle, over Appellant's unsuccessful objection, conducted a 31–page cross-examination which included an offer of proof.

Respondent presented five additional witnesses before resting. Hickle cross-examined all but one.

Appellant then presented seven witnesses (including himself and one of the witnesses presented earlier by Respondent). Hickle cross-examined Appellant and all his other witnesses except one.

After all parties rested, Hickle presented one of the foster parents as a witness, adducing evidence that both foster parents have college degrees and that during the 21 months D_____ and her half-sister, N_____, had lived with the foster parents, D_____ and N_____ had developed a loving relationship as "sisters."

On at least 14 occasions, the trial court sustained objections by Hickle to questions propounded by Appellant's lawyer to various witnesses. Hickle also cited and argued law to the trial court.

*Matter of Trapp*, 593 S.W.2d 193 (Mo. banc 1980), was a neglect proceeding involving, at the outset, four children. The juvenile court assumed jurisdiction of them in 1973. In 1978, the mother sought to regain custody. Foster parents who had been caring for one of the children several years moved to intervene, alleging they wanted to adopt her. The juvenile court granted the motion. The Supreme Court of Missouri held this was error, observing that the presence of the foster parents in the neglect proceeding would tend to inject the false issue of their fitness to have custody, when the sole issue for determination is the present fitness of the parents to have custody restored to them. *Id.* at 205. The opinion explained:

> The General Assembly has not authorized the removal of children from the custody of their parents on the ground that the children would be "better off" in another home.

*Id.* at 206.

Two years after *Trapp*, the Supreme Court of the United States decided *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), holding due process requires public officials to prove grounds for termination of parental rights by clear and convincing evidence. 102 S.Ct. at 1402–03[13–15]. Pertinent to the instant case, the majority opinion in *Santosky* said:

> However substantial the foster parents' interests may be, ... they are not implicated directly in the factfinding stage of a state-initiated permanent neglect proceeding against the natural parents.

*Id.*, 102 S.Ct. at 1399.

Meanwhile, in 1981 the Western District of this Court had decided *In Interest of M_____ K_____ P_____*, 616 S.W.2d 72 (Mo.App.1981), an appeal from an order terminating parental rights. One of the claims of error was that the trial court permitted the foster parents to intervene and allowed their lawyer to advise the juvenile officer. Citing *Trapp*, the Western District held the intervention was error. 616 S.W.2d at 79. However, the Western District examined the record and concluded that the foster parents' lawyer was not involved in the hearing, asked no questions, and made no plea to the court. *Id.* Furthermore, the false issue of fitness of the foster parents was not injected. The termination order was affirmed.

In 1985, the General Assembly of Missouri enacted § 211.464. Laws of Missouri 1985, H.B. 366, et al., § A, pp. 605–24. Section 211.464 reads:

> Where a child has been placed with a foster parent, with relatives or with other persons who are able and willing to permanently integrate the child into the family by adoption, if the court finds that it is in the best interests of the child, the court may provide the opportunity for such foster parent, relative or other person to present evidence for the consideration of the court.

The year after § 211.464 was enacted, this District decided *In Interest of M.B.A.*, 709 S.W.2d 941 (Mo.App.1986), a mother's appeal from an order terminating her parental rights to three children. One of her assignments of error concerned the alleged "interference" of the foster parents in the termination proceeding. We noted the trial court excluded the foster parents from the courtroom after the "Rule" barring witnesses was invoked; an aunt appeared as a witness and presented relevant testimony concerning the extent of parental neglect; and a lawyer for the foster parents presented testimony identifying relevant documents. Citing § 211.464, we held such evidence was material to the termination issue and the role of the foster parents did not taint the proceeding. 709 S.W.2d at 945–46[3].

■ Intervention is a proceeding by which a third person is permitted by the court to make himself a party, either joining the plaintiff in claiming what is sought by the petition, or uniting with the defendant in resisting the plaintiff's claim, or demanding something adversely to both. *Young v. Pressgrove*, 355 Mo. 204, 195 S.W.2d 516, 518[2] (1946).

Here, the foster parents, through lawyer Hickle, participated in the trial just like a party. The trial court did not confine Hickle's role to presenting evidence relevant to the termination issue. Hickle was allowed to, and did, make objections, argue the law, and present testimony by one of the foster parents demonstrating the education of the foster parents and their affection for D——— and N———. Such evidence had nothing to do with whether one or more grounds existed for termination of Appellant's parental rights to D———.

The transcript confirms the trial was a four-sided contest in which Hickle's participation equaled or exceeded that of each of the other three litigants.

■ We need not attempt to comprehensively delineate the boundary of a foster parent's role under § 211.464 in a termination proceeding. Arguably, it includes representation by counsel for the purpose of assembling and presenting evidence relevant to the grounds for termination pled in the petition. However, we hold § 211.464 does not authorize a trial court to grant foster parents the right to participate in a termination proceeding as full-fledged parties in everything but name, nor does it authorize them to present evidence alien to the termination issue.

Here, the participation of the foster parents encroached into areas forbidden by *Trapp*, M——— K——— P———, and *M.B.A.* On several occasions, Hickle registered objections to questions asked witnesses by Appellant's lawyer when no party objected, and the objections were sustained. Even if the rulings were correct, which we need not decide, it is manifest that the foster parents' roles in the trial were those of parties in everything but name. To countenance what occurred here would ignore *Trapp*, M——— K——— P———, and *M.B.A.*

■ We hold the trial court erred in allowing the foster parents, through lawyer Hickle, to participate to the extent shown here, and such participation tainted the proceeding to a degree that reversal is required.

This ruling does not complete our task. Normally, when a judgment is reversed for trial error, the case is remanded for a new trial. *Taylor v. Kansas City Southern Ry. Co.*, 293 S.W.2d 894, 898[4] (Mo.1956); *Clark v. Atchison & Eastern Bridge Co.*, 333 Mo. 721, 62 S.W.2d 1079, 1082[12] (1933). Remand for a new trial has been ordered even where reversal is for failure to make a submissible case. *Reece v. Reed*, 326 S.W.2d 67, 72 (Mo.1959).

Here, however, we have an action by a public official to terminate a parent's right to a child. If, in adjudicating this appeal, we find the evidence insufficient to support any ground for termination, would it be proper to remand for a new trial, thereby affording the official a second opportunity to marshal evidence and present a stronger case? Little guidance is found in the Missouri decisions.

In one, *In Interest of S——— G. G———*, 779 S.W.2d 45 (Mo.App.1989), we

reversed an order terminating a mother's parental rights but did not remand for a new trial; however, the only ground for termination was abandonment and we held the evidence insufficient to support that ground. It is obvious from the opinion in S_____ G. G_____ that no better case for abandonment during the relevant period could have been made at a second trial. *Id.* at 53–54[8].

In *R.D. by Reine v. I.D.*, 778 S.W.2d 848 (Mo.App.1989), a guardian ad litem for a child appealed from an order *denying* a petition to terminate the mother's parental rights. The Western District of this Court held the order unappealable in that jurisdiction over the child would continue in the juvenile court and further orders as to care and placement would be required. *Id.* at 851. The opinion added:

> The present judgment denying termination does not foreclose the prospect that another petition for termination may be presented to the court at a future date nor is the present judgment a bar to a later order of termination based on different grounds or additional evidence.

778 S.W.2d at 851.

Whether the court in *R.D.* would affirm a later order terminating parental rights based on the same grounds arising during the same period but supported by additional and stronger evidence is uncertain.

Outright reversal was the result of *In Interest of R.S.P.*, 619 S.W.2d 863 (Mo. App.1981), a mother's appeal from an order terminating her parental rights to three children. Evidently, the petition to terminate had been based on two grounds. The Western District of this Court held the evidence insufficient to support either ground. *Id.* at 865. The opinion concluded by saying:

> Reversal of this proceeding does not ... change the status of these children nor bar the institution of another proceeding ... for the termination of parental rights.

619 S.W.2d at 866[8].

While *R.S.P.* did not foreclose a new termination proceeding, it did not remand for retrial of the grounds that lacked evidentiary support.

■ With the case law in this posture, we have concluded we should determine whether at least one of the grounds relied on by the trial court in terminating Appellant's parental rights is supported by clear, cogent and convincing evidence.[7] If the record demonstrates such evidentiary support, we perceive no reason to deny Respondent an opportunity to seek termination in a new trial free from prejudicial participation by the foster parents.

■ Among the findings in the order terminating Appellant's parental rights are these:

6. [D_____] has been adjudicated to have been neglected by this Court.

7. [Appellant] has a mental condition such that there is no reasonable likelihood that the condition can be reversed and which renders him unable to knowingly provide the said minor child the necessary care, custody and control. In particular, [Appellant] has an intellectual ability classification of borderline intellectual functioning, has a mental age of 13.7 years, and is diagnosed as having an antisocial personality disorder.

. . . .

9. [Appellant] has repeatedly and continuously failed, although physically and financially able, to provide said minor child with adequate food, clothing, shelter or education as defined by law, or other care and control necessary for the minor child's physical, mental or emotional health and development. [Appellant] provided no support or payments for the cost of care for said minor child for a period of over two (2) years, from August 1988 until 26 September 1990. During the thirty-seven (37) days between 26 September 1990 and the date the [First Amended] Petition For Termination Of Parental Rights was filed in this cause, on 2 November 1990, [Appellant] paid a total of Seventy–Five Dollars ($75.00) in child support after having failed to pro-

---

7. Section 211.447.2, footnote 5, *supra.*

vide any support whatsoever for the preceding two (2) years. The Court finds that [Appellant] was either gainfully employed or capable of gainful employment and that the failure to provide such support was willful and substantial. Further, the Court finds that during the months that [Appellant] failed to contribute to his daughter's support, he acquired a television set and a video recorder, and made monthly payments on the debts thereon.

10. [Appellant] has lived with a woman not his wife, and was having a sexual relationship with the woman's fifteen-year-old daughter, at a time when he could have, and should have, been living with and supporting his own daughter.

. . . .

13. [Appellant] maintained visitation as permitted by [DFS] on a regular basis while the minor child was under the jurisdiction of this Court. That between December, 1987 and August, 1988, the minor child lived with [Appellant's] mother, but [he] failed to live with his daughter and instead lived in various other locations. That between August, 1988 and April, 1989, the minor child lived with the child's natural mother, and [Appellant] did not make any arrangements during this period to visit the minor child.

Arguably, the above findings could pertain to either the ground of abandonment or the ground of neglect. The order does not state which. Consequently, we shall first consider whether there was clear, cogent and convincing evidence of abandonment. Appellant's point IV maintains the evidence was insufficient to support termination on that ground, and was likewise insufficient to support termination on the grounds of neglect or failure to rectify.

Appellant begins his argument by stating that inasmuch as Respondent's original petition to terminate Appellant's parental rights was filed October 22, 1990, the period for which abandonment should have been shown was "from April, 1990 to October, 1990."

Appellant misreads the statute. It does not require the period of abandonment to be the six months immediately preceding the filing of the petition. It merely requires a six-month period of abandonment if the child is over one year of age at the time of filing of the petition.

■ Child abandonment is generally not compatible with a case where custody has been taken from a parent involuntarily by court order. *In Interest of W.F.J.,* 648 S.W.2d 210, 215[11] (Mo.App.1983). This is because the enforced separation of parent and child and placement of the child in a foster home operates to accomplish some estrangement and, without effort by authorities to effect reconciliation, operates to create the very circumstances which destroy the parent-child relation. *In Interest of Baby Girl W.,* 728 S.W.2d 545, 549[10] (Mo.App.1987).

Furthermore, abandonment as defined in § 211.447.2(1)(b) [8] consists of two elements: first, leaving the child without any provision for parental support and, second, without making arrangements to visit or communicate with the child, although able to do so. *S_____ G. G_____,* 779 S.W.2d at 53. Here, Appellant asked DFS for, and received, regular visitation with D_____ within a month after she was placed in DFS custody. Appellant faithfully exercised the visitation granted by DFS. Accordingly, abandonment cannot be shown for any six-month period after April 7, 1989.

D_____ lived in the same household as Appellant the first eight months of her life. Obviously, no abandonment occurred during that period.

J_____ and D_____ were then gone from Appellant, living first with C_____ Y_____ and later with J_____'s mother. However, the evidence failed to show this odyssey lasted six months. Inferably, it was around four.

J_____, D_____ and Appellant then reunited, and occupied the same residence until December 20, 1987. No abandonment during that period was shown.

**8.** Footnote 5, *supra.*

The issue thus becomes whether there was clear, cogent and convincing evidence demonstrating a six-month period between December 20, 1987, and April 7, 1989, during which Appellant, without good cause, left D_____ without any provision for parental support and without making arrangements to visit or communicate with her, although able to do so.

As reported earlier, D_____ was with Appellant's mother, E_____, from December 20, 1987, until August 18, 1988, when J_____ won the second habeas corpus action. Appellant did not reside with E_____ and D_____ during that period. He lived in a trailer, then at three different addresses with his "sister-in-law," then in a tent with her at E_____'s. We find no evidence that Appellant made any provision for parental support of D_____ during this period, and no evidence he arranged to visit or communicate with her.

However, we find no clear, cogent and convincing evidence that he failed to do so. While it is inferable that Appellant failed to support and visit D_____ during this period, the evidence does not explicitly confirm that assumption.

There is, however, evidence which, if believed, shows abandonment from August 18, 1988, to April 7, 1989, the second period when J_____ and D_____ lived in the household of C_____ Y_____. J_____ testified:

Q. ... During that eight-month period of time, did [Appellant] ask you for permission to see [D_____]?

A. No, he did not.

Q. Did he even indirectly ask you; in other words, did he send a friend or anybody else, police or somebody to try to set up a visitation schedule?

A. No, he did not.

Q. Did he give any presents during that period of time?

A. No, he did not.

Q. Did he pay any child support during that period of time?

A. No.

Q. Did he offer to pay any child support?

A. No.

Q. Did he do—Did he have any communication to you—Or did he give any communication to you at all where he expressed any interest in his daughter during that eight-month period of time?

A. No.

As we have seen, in finding "9" the trial court found Appellant provided no support for D_____ from August, 1988, until September, 1990, when he began paying the $25 per month called for in the DFS service plan. In finding "13," the trial court found that while D_____ was living with J_____ from August 18, 1988, to April 7, 1989, Appellant made no arrangements to visit D_____.

It thus appears the trial court found the evidence sufficient to satisfy the clear, cogent and convincing standard in demonstrating abandonment from August 18, 1988, to April 7, 1989. Additionally, at retrial Respondent may be able to meet that standard for the period from December 20, 1987, to August 18, 1988.

We therefore grant Respondent the opportunity to establish grounds for termination at a new trial. Having decided that, we need not comment on whether the evidence in this record was sufficient to support termination on the grounds of either neglect or failure to rectify. At retrial, Respondent will be free to prove any pleaded ground for termination.

■ The only point we have not yet addressed is point II, which reads:

The provisions of § 211.447.2(3) and § 211.464 of the Missouri termination statutes violate both the substantive and procedural rights of due process as guaranteed by the Fourteenth Amendment to the United States Constitution and the Constitution of the State of Missouri.

A. The statutory grounds for termination set forth in § 211.447.2(3) are not only unconstitutionally vague but purport to authorize termination without fault of a parent as well.

B. To the extent that § 211.464 purports to authorize direct participation by foster parents in the fault-finding

phase of termination proceedings, it impermissibly violates due process.

Article V, § 3 of the Constitution of Missouri (1945, amended 1982), reads:

The supreme court shall have exclusive appellate jurisdiction in all cases involving the validity of ... a statute ... of this state....

Inexplicably, Appellant lodged this appeal with us instead of the Supreme Court of Missouri. A challenge to the validity of a statute is inconsistent with prosecution of an appeal to the Court of Appeals, for if the constitutionality of a statute is raised the Supreme Court of Missouri has jurisdiction over the entire case. *McLeran v. St. Luke's Hospital of Kansas City*, 687 S.W.2d 892, 893[3] (Mo. banc 1985). Resolution of the constitutional attacks on the statutes in Appellant's point II would require us to transfer this case to the Supreme Court, as we lack appellate jurisdiction to decide such issues. *McDonald v. McDonald*, 766 S.W.2d 715, 717[1] (Mo. App.1989).

However, constitutionality of a statute will be addressed only when necessary to dispose of the appeal. *Stenger v. Great Southern Savings and Loan Ass'n.*, 677 S.W.2d 376, 382[6] (Mo.App.1984). *Cf. State ex rel. Williams v. Marsh*, 626 S.W.2d 223, 227[1] (Mo. banc 1982).

Here, one of the statutes challenged by Appellant is § 211.447.2(3), which makes failure to rectify a ground for termination. In holding the order terminating Appellant's parental rights must be reversed and the case must be remanded for a new trial, we found it unnecessary to consider the constitutionality of that statute or whether Respondent presented sufficient evidence to support termination on that ground.

The other statute challenged by Appellant is § 211.464. In deciding Appellant's point I, we held that statute did not allow foster parents to participate in a termination proceeding to the extent shown here, and their participation constituted reversible error. Consequently, we did not reach Appellant's constitutional attack on the statute.

The order terminating Appellant's parental rights to D_____ is reversed and the case is remanded for a new trial.

PREWITT, P.J., concurs.

PARRISH, J., concurs in result and files concurring opinion.

PARRISH, Judge, concurring.

I concur in the result reached by the principal opinion. I further concur in its discussion of all the issues addressed other than its discussion of Point III.

As the principal opinion states, appellant's claims include his assertion, "[I]f termination is sought against a parent who is not the parent who earlier had been found to be ... neglectful, then the Order conferring jurisdiction and divesting custody from him must contain findings that said parent is either unavailable, unwilling or unable to care for the child." In addressing that claim, the principal opinion states that an adjudication of neglect in a juvenile court proceeding brought pursuant to § 211.031.1(1)(a),[1] when used as a basis for terminating parental rights in a separate action brought for that purpose, is used only to show that "the *child* has been adjudicated neglected, not ... [that] the *parent* has been adjudicated neglectful." Based upon that premise, the principal opinion concludes that the acts of appellant—a parent who did not have custody of the child when neglect occurred—are subject to scrutiny only in conjunction with the juvenile court's consideration and findings that are required by § 211.447.2(2), i.e., only for purposes of determining what would be in the best interests of the child.

Notwithstanding that an adjudication of neglect is a determination that the child has been neglected, in a proceeding to terminate parental rights, it is a right of a particular parent, in this case appellant, that a juvenile court undertakes to extinguish. The order that adjudicated the child to be neglected was silent as to the culpa-

---

1. References to statutes are to RSMo 1986.

bility, if any, of appellant, the child's father. Finding no explicit language in § 211.447.2(2) to the effect that failure to rectify a condition of neglect may be a basis to terminate parental rights of such a parent, I decline to join in the declaration of the principal opinion that so states.

I concur in the assessment that there was sufficient evidence from which the juvenile court could have found abandonment by appellant. I likewise concur in the holding that the juvenile court erred by allowing the attorney for the foster parents to participate in the evidentiary hearing to the extent reflected by the record on appeal, and that the attorney's involvement tainted the proceedings to an extent that the case must be reversed.