

# In the Missouri Court of Appeals
# Eastern District

## DIVISION ONE

IN THE INTEREST OF: S.R.W.    )        No. ED112622
    )

    )        Appeal from the Circuit Court
    )        of St. Charles County
    )        Cause No. 23AD-JU00122
    )

    )        Honorable Vincent Johnson
    )

    )        Filed: June 17, 2025

## Introduction

Mother and Father appeal from the trial court's judgment terminating their parental rights to S.R.W. ("Child"). On appeal, Father and Mother argue there was insufficient evidence supporting the trial court's findings on failure to rectify and parental unfitness, that the trial court erred in finding it was in Child's best interest to terminate parental rights, and in not allowing them to reopen evidence following trial.[1] We affirm the judgment of the trial court.

---

[1] Mother previously filed a motion to adopt Father's brief as her own for the purposes of this appeal. This Court denied that motion. In her brief, Mother adopted Father's points on appeal and facts section verbatim. Additionally, Mother's argument section substantially copies Father's argument with minor edits (i.e., changing "Father" to "Mother", and deleting argument relating solely to Father). Rule 84.04 sets forth the requirements of briefs filed in appellate courts. *Bi-National Gateway Terminal, LLC v. City of St. Louis*, 697 S.W.3d 593, 597 (Mo. App. E.D. 2024). "Compliance with Rule 84.04 is required to give notice to the other party of the precise matters at issue and to ensure that appellate courts do not become advocates for the appellant by speculating facts and arguments that have not been made." *Id.* (quoting *Murphy v. Steiner*, 658

1

**Factual and Procedural History**

Facts[2]

Child was born in July 2021. Following Child's birth, medical personnel had concerns about Mother and Father not being able to give Child appropriate care despite medical personnel giving them infant education. There were also concerns with Father's claim that he would take the baby and care for Child alone. Additionally, Mother checked herself out of the hospital early against medical advice despite Child needing close monitoring and feeding care. As a result of these concerns, a newborn crisis assessment was completed while Child was still in the hospital. Then, the Children's Division performed an investigation, filed a petition to take custody of Child, and took custody of Child.

*Mother*

---

S.W.3d 588, 591 (Mo. App. W.D. 2022)). Mother's verbatim copying and pasting of Father's facts, points relied on, and argument sections makes this Court's job quite difficult because Mother's brief does not distinctly advise the other party and this Court as to Mother's precise matters at issue. This Court is left to parse, on its own, the specific factual differences and potential arguments based on those differences between Mother's and Father's claims. Mother's briefing requires this Court, in effect, to become an advocate for Mother which is impermissible. *Id.* To the extent we can understand the facts and arguments without advocating, we review *ex gratia*. We view the facts in a light most favorable to the trial court's judgment, and set forth the facts specifically as to each parent.

[2] Father's and Mother's statements of facts violate Rule 84.04(c). Rule 84.04(c) requires appellants provide a "specific page references to the relevant portion of the record on appeal, i.e., legal file, transcript, or exhibits." Appellants' statements of facts violate Rule 84.04(c) by providing no citations to the record whatsoever. By providing no citations to the record, Appellants' statements of facts fail "to fulfill [their] 'primary purpose'—'to afford an immediate, accurate, complete, and unbiased understanding of the facts of the case.'" *Litvinchyk v. Div. of Emp't Sec.*, 449 S.W.3d 810, 811 (Mo. App. S.D. 2014) (quoting *Nichols v. Div. of Emp't Sec.*, 399 S.W.3d 901, 903 (Mo. App. W.D. 2013)). Failure to follow the requirements of Rule 84.04(c) constitutes grounds for dismissal. *Republic Finance, LLC v. Ray*, 698 S.W.3d 184, 187 (Mo. App. E.D. 2024). Because a parents right to raise their child(ren) is a fundamental liberty interest, we elect not to dismiss.

2

After the Children's Division took custody of Child, Mother was placed on a service plan. This plan required visitation with Child; financially supporting Child by providing food, formula, clothes, gifts, and monetary support; paying child support; attending parenting classes; and working with a parent aide/coach, among other requirements.

Early in the process, Mother visited Child, but later all visits to Child stopped. Mother was ordered to participate in services for the return of Child, but she did not participate in any services other than when the parent aide went to the home to help with parenting skills. Mother has an intellectual disability which required supervision and a safety plan when she was with Child. During a trial placement, Mother attempted to feed Child and was observed on several occasions feeding Child with a dirty utensil and out of previously-opened jars of baby food. Mother was not employed and did not have independent housing. Mother was dependent upon Father to take primary responsibility for Child's care. Mother did not care for Child.

Mother appeared at the first review hearing in November 2021. The juvenile officer report, at that time, reported that Mother had an intellectual disability and "did not wish to work her service plan, get referrals for services, or wish to reunify with the baby." Mother indicated she wanted Father to have full custody of Child.

Mother was not present for most of her remaining case review hearings and the juvenile officer reported Mother was not compliant with her service plan. Eventually, the juvenile officer filed a petition to terminate parental rights and Mother appeared at the March 2024 termination of parental rights hearing with her attorney and appointed guardian ad litem.

At that hearing, witnesses who had interacted with Mother indicated she was mostly non-verbal, and they were concerned that Child could not safely be in her care. Mother did not know how to feed Child and properly dispose of Child's diaper. Mother previously had left a diaper

3

open on the floor with feces when the Child was on the floor nearby. Another witness was also concerned that Mother was unable to properly hold Child so Child did not fall off of the couch.

Hospital records from Child's birth also demonstrate Mother's cognitive delay. Staff noted that Mother had little signs of understanding how to feed child and that Mother did not understand that she could not keep a blanket on Child's face or it would risk suffocating Child. Mother also, though attempting to engage, "lack[ed] understanding and carryover of education . . . ." Finally, the records noted both "parents' lack of understanding of infant's signs of stress during feeding."

At the termination of parental rights hearing, Mother's guardian ad litem was present and when asked by the court whether her client was able to comprehend the proceedings she answered "No" because she did "not believe that [her] client underst[ood] the nature of the proceedings." Moreover, she did not believe that Mother would even "be capable of . . . testifying or understanding the questions that would be asked of her." Additionally, Mother's guardian ad litem testified that she did not believe Mother could safely parent Child.

*Father*

Father too was placed on a service plan. His service plan required visitation with Child; maintaining suitable housing; financially providing for the child by providing food, formula, clothes, gifts, and monetary support, paying child support; parenting class; a psychological evaluation; counseling; working with a parent aide/coach; and drug screening.

Father partially complied with the service plan. Father attended parenting classes and worked with a parent aide or parent coach. Father regularly visited Child, but sometimes he would fail to show up, show up late, or he would leave early. Also, during these visits Father would be minimally engaged with Child, and instead would be on his cell phone. During the

4

visits, Child would not interact with Father and did not seem to bond with Father. Instead, Child seemed to bond and interact more with her grandfather, who accompanied Father on some visits.

Father held employment for a brief period, but is currently unemployed, and has not maintained appropriate and consistent employment. Additionally, Father listed certain jobs on his resume but he did not hold them.

Father maintained a place to live, but there was debris all over the floors, and it appeared that the floors had not been cleaned between the home visits throughout a year. In the home, Father failed to have age-appropriate toys for Child. Also, Father had things within Child's reach that Child could choke on or injure Child.

Father did not provide food or clothing for Child. At one point, the case manager ordered formula for Child and had it delivered to Father because she was concerned about Child not having any. The deputy juvenile officer also found that Father lacked having formula for Child. Every time after Child visited with Father, Child's foster parents would have to immediately feed Child because Child was not getting enough to eat during the visits.

Father had not provided any financial support for Child. The deputy juvenile officer had concerns about Father being able to financially support Child because Father's only income was a disability payment of approximately four-hundred dollars a month. The deputy juvenile officer did not believe Father could support Child on that income.

The Children's Division did two trial home placements with Child. The first started in April 2022, and lasted four months. At a home visit during the first placement, the deputy juvenile officer observed a disheveled and dirty home with the lack of age appropriate toys. When walking through the home, the deputy juvenile officer also observed a lack of food for Child, and when Father was asked about the lack of food and what he would do about it, he did

5

not have an answer. The deputy juvenile officer also discussed Father's belief that Child was "overweight and overfed" with Father. Because of the lack of feeding, Child has lost a pound and a half while in Father's care even though Child had previously and steadily gained weight while in foster care.

At another home visit during the first placement, the deputy juvenile officer observed spoiled food sitting out, which included formula that had curdled and separated along with blood from red meat that had dripped onto fruit in the refrigerator and the blood leaked out of the bottom of the refrigerator. The deputy juvenile officer saw that Father was standing in dog urine during this visit. When the deputy juvenile officer asked Father about these conditions, he did not seem to acknowledge they existed. Ultimately, the court terminated the trial home placement at a hearing in August 2022 because there were concerns about Father's care of Child.

A second trial home placement began in late February or early March of 2023. This placement ended shortly after it began due to Father's use of marijuana in the home and Child's hair follicle testing positive for the presence of marijuana. Father also tested positive for the presence of marijuana, after initially denying use. When Father was asked about Child testing positive for marijuana, Father blamed it on Child's foster parents and did not take any responsibility. Based upon Child's positive test and other observations in the home, the deputy juvenile officer had major concerns about returning Child to Father.

Following Father's positive marijuana test, Father has not participated in any testing or shared any information regarding his sobriety. But Father later admitted to smoking two to three grams of marijuana daily.

During the second placement, Father did not give Child adequate medical care. Father believed that Child had an ear infection, but waited a week before seeking treatment. Child

ended up having a double ear infection. Also, during the case manager's home visit Child was congested and the case manager learned from Father that Child had a fever and was whining constantly. When the manager asked if Father had taken Child to the doctor, Father replied he had not and instead had given Child a homeopathic treatment that he found online of some ancient Chinese garlic milk.

Throughout the course of Father's service plan, Father had a history of making conflicting and inaccurate statements. Father had not been open to the feedback and advice on parenting Child. Father had also demonstrated aggressive behavior by making threats against the case manager when she would say things that would upset him or when he did not agree with something. For example, Father told the case manager on the day that she took Child from the home when the last trial home placement ended, "Somebody else is going to be raising your kids." When she asked Father what he meant, Father stated, "You know what I mean. Somebody else is going to be raising your kids."

Despite Father's threats, Father's case manager attempted to teach Father how to properly store food, and went to the home to help him appropriately clean the home. The case manager indicated she was attempting to reunify the family, in Child's best interest. But the case manager knew of no other services that she could have offered that could have allowed Child to be successfully at home with either parent. The case manager believed she could not have done anything more to help Father be successful. Father had not been receptive to the case manager's efforts.

The deputy juvenile officer stated that she had concerns with Father providing long term care for Child because Father did not understand what is age appropriate, proper feeding and discipline, and when Child may be getting ill and when it is appropriate to take Child to the

doctor. The officer concluded that without constant supervision from the Children's Division, Child would be in danger if she was returned home. Father's case manager agreed with this conclusion.

Child's foster parent also had issues with Father when she attempted to speak about Child's care. Father would not speak about Child or Child's care. When Child's foster parent would attempt to engage Father, he would blatantly ignore her and "just turn around and walk out with her and just walk away." On one occasion, Father accused Child's foster parent of pinching Child in an attempt to make her cry. Father frequently complained about the care Child's foster parent was giving her.

Father, while denying he had disability, indicated that he received psychiatric or psychological care in the past. This was after he was diagnosed with an intellectual disability and ADHD. Father received treatment, but Father has since stopped treatment, and has only briefly reengaged with other services.

In the three years Child has been under the care of others, Child was not able to be successfully reunified with either parent. The case manager believed that Child needed permanency and it would be in Child's best interest that both Mother's and Father's parental rights be terminated because they had not made any progress that would enable her to go home in the foreseeable future.

Procedural History

On July 10, 2021, Child was placed in foster care, and has remained in foster care through the present. Child was placed in protective custody of the Children's Division on July 13, 2021, following a hearing on July 12, 2021.

On August 27, 2021, the trial court found that the child was within Section 211.031,[3] and placed custody of Child with the Children's Division. The court found Child needed care and treatment because Father and Mother neglected the child by failing to provide proper care and supervision of her and by exhibiting a deficient understanding of child development and care. The court based its findings on testimony of hospital staff demonstrating the parents' lack of suitable housing, not attending to the child's basic needs, and concern with the parents' lack of capability in caring for Child.

After placing Child in the custody of the Children's Division, the court held a dispositional hearing on September 7, 2021, and after further briefing and recommendations from the Children's Division and Mother's guardian ad litem, the court ordered that Mother take part in a parenting class, receive a psychological evaluation, work with a parent aide, receive drug screenings, maintain appropriate and consistent employment finances, and produce a written child care plan.

The court then held regular case review hearings from November 2021 to March 2024. The court continued to affirm its permanent plan as reunification of Child with her parents until its Permanency Hearing in October of 2023, where it changed its plan to adoption, while retaining the goal of reunification as well. In the court's March 2024 case review, it fully changed its plan to adoption.

Simultaneously on April 20, 2023, the Children's Division filed a Petition to Terminate Parental Rights. The circuit court held a termination of parental rights hearing on March 5, 2024.

---

[3] All statutory references are to the Revised Statutes of Missouri (2016), unless otherwise indicated.

Following the hearing, the court issued its judgment and decree terminating parental rights of both Father and Mother.

Mother and Father appealed separately. On this Court's own motion, the Court consolidated the appeals.

**Discussion**

We address Father's four points first, followed by Mother's four points.

<u>Father's Point One</u>

In his first point, Father argues the trial court erred in terminating his parental rights in that there was insufficient evidence to support its finding and conclusions pursuant to Section 211.447.5(3) (failure to rectify).

*Standard of Review*

"In termination of parental rights cases, we will sustain the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Interest of K.A.M.L.,* 644 S.W.3d 14, 20 (Mo. App. E.D. 2022). "The evidence is viewed in the light most favorable to the trial court's judgment and will be reversed only if we are firmly convinced the judgment is erroneous." *Id.* "The party seeking termination bears the burden of proof." *Id.* "We recognize the trial court is better positioned than this Court to determine witness credibility and weigh evidence in the context of the whole record." *Id.*

*Analysis*

"To terminate a party's parental rights, a trial court must: (1) find by 'clear, cogent, and convincing evidence' that one or more grounds for termination of parental rights exists, and (2) determine whether it is in the child's best interest to terminate a party's parental rights." *Id.* at 22.

10

"Evidence that is 'clear, cogent, and convincing' instantly tilts the scales in favor of termination when weighed against the evidence in opposition, and the trier of fact is left with an abiding conviction that the evidence is true." *Id.* "Section 211.447 provides the statutory grounds for judicial termination of parental rights." *Id.* at 22-23. The trial court found grounds existed for the termination of Father's parental rights under sections 211.447.5(3), failure to rectify, and 211.447.5(5), parental unfitness. "These are separate grounds for termination, and we will affirm the trial court's ruling if one is appropriate." *Id.* at 23. "If the trial court finds at least one statutory ground for termination exists, the court must then determine whether, by a preponderance of the evidence, the termination of parental rights is in the child's best interest." *Id.* (citing Section 211.447.7).

Section 211.447.5(3) provides that the juvenile officer or the division may file a petition to terminate parental rights if:

> The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.

Section 211.447.5(3). In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:

> (a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;
> (b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;
> (c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be

11

reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control. . .

*Id.* "These factors 'are not separate grounds for termination by themselves, but rather categories of evidence that the court may consider along with all other relevant evidence in determining whether grounds for termination exist under Section 211.447.5(3).'" *K.A.M.L.*, 644 S.W.3d at 23 (quoting *In Interest of K.M.A.-B.*, 493 S.W.3d 457, 474 (Mo. App. E.D. 2016)). "While a court must make findings on all four factors, evidence supporting just one factor is sufficient to terminate parental rights." *Id.* at 23.

Father argues that the trial court's findings are not supported by clear, cogent, and convincing evidence.[4] We address each finding in turn.

(a) Service Plan

Father contends that he completed a significant amount of the services detailed in his service plan. Father then argues that the trial court's concern with stable housing and financial ability to provide for the Child is unfounded because "Father had maintained the same housing from the beginning of the case and had managed to make do financially during the pendency of the case."

---

[4] In his point relied on, Father argues there is insufficient evidence to support the findings. However, in his argument section, Father argues the trial court's findings are against the weight of the evidence. These are separate claims. For Father "to be successful on a claim that there was insufficient evidence, Father would be required to demonstrate that there was no substantial evidence to support the circuit court's judgment." *J.A.R. v. D.G.R.*, 426 S.W.3d 624, 629 (Mo. banc 2014). "A claim that the judgment is against the weight of the evidence presupposes that there is sufficient evidence to support the judgment." *Id.* at 630. We proceed under the claim in the point relied on, that there was insufficient evidence supporting the judgment.

12

The trial court found that Father did indeed participate in services during the life of the case, but it was inconsistent at times. While Father did maintain a home, the home was unsanitary and unsafe despite the instruction from the case workers on proper food storage and cleaning. Testimony demonstrated that Father left out spoiled food including formula that had curdled and separated along with blood from red meat that dripped onto fruit in the refrigerator and was leaking out of the bottom of the refrigerator. There was also testimony that Father was standing in a puddle of dog urine during a home visit, and Father, when asked about the unsanitary conditions, did not seem to acknowledge they existed. Testimony also revealed that Father left out items within Child's reach that Child could choke on or injure herself. The failure to maintain clean, sanitary, and safe housing can lead to a finding of substantial evidence of failing to comply with the service plan. *Interest of A.M.W.*, 652 S.W.3d 225, 237 (Mo. App. W.D. 2022). This also includes the failure to seek adequate medical care. *Id.* Here, Father did not seek medical care when Child had a double ear infection and Father's actions of not adequately feeding Child caused Child to lose weight even though Child had normally gained weight while in foster care.

Although Father claims he managed to "make do" financially during the pendency of the case, the testimony presented during trial demonstrates otherwise. Testimony demonstrated that the deputy juvenile officer had concerns about Father being able to financially support Child. Father had not provided any financial support for the Child. This was because Father's only income was a disability payment of approximately four-hundred dollars per month. The deputy juvenile officer did not believe Father could support Child on that income.

"Partial compliance with a service plan does not prevent a court from finding grounds for termination as a result of a failure to rectify conduct or conditions." *In re G.G.B.*, 394 S.W.3d

13

457, 470 (Mo. App. E.D. 2013). "The failure to achieve progress towards the terms of a social service plan supports termination of parental rights when a dangerous condition is left uncorrected as a result." *Id.* (quoting *In re I.G.P.,* 375 S.W.3d 112, 121 (Mo. App. W.D. 2012)) (internal quotation marks omitted).

Father's actions of maintaining an unsafe and unsanitary home environment for Child is supported by cogent, convincing, and clear evidence. As the trial court found, these conditions twice required the trial court to terminate the home placements. Although Father was successful in some respects in completing aspects of the service plan, Father was "unable to consistently and adequately meet the [child's] needs." *A.M.W.*, 652 S.W.3d at 238. Thus, substantial evidence supports the trial court's findings.

(b) Agency Efforts

Father argues that, following the termination of the second trial home placement, no further services were offered to him. While Father's argument is factually correct, it simply ignores all of the agency efforts during the pendency of the case up to the termination of the second trial home placement. The trial court found that the case manager "had done things in this case that she did not normally do – such as buy and pay for formula for the child, assist Father with actually cleaning the child's home, teach Father how to safely store food and/or provide ongoing parenting advice even in the face of Father's hostility towards her. The case manager reported that at times Father would accept her help – however at other times when Father became angry he threatened her life." The trial court also found that "the Deputy Juvenile Officer and the foster parent experienced the same hostility and inconsistency from Father." These findings are supported by cogent, clear, and convincing evidence. Despite these agency efforts, Father has not been able to make a sustained change to appropriately care for his child.

14

## (c) Mental Condition

Father does not challenge the trial court's findings on Father's mental health conditions. The trial court concluded it did not have sufficient evidence to determine whether Father suffered from a permanent mental condition. The trial court found that "Father's behavior provides many red flags and concerns, but whether his behavior is due to an irreversible mental condition is not able to be determined at this time." Nonetheless, the trial court found that "Father's mental health is compromised at this time, and it would appear it is having an impact on his ability to parent. While the Court cannot diagnose Father, his behavior is cause for concern, and a mental illness cannot be ruled out from the information the Court has." This factor need not support termination independently, but can be considered "along with all other relevant evidence in determining whether grounds for termination exist under Section 211.447.5(3)." *K.A.M.L.*, 644 S.W.3d at 23 (quoting *K.M.A.-B.*, 493 S.W.3d at 474).

## (d) Chemical Dependency

The trial court found that "Father has a current chemical dependency that has impacted his ability to provide safe care for his child." The trial court concluded:

> Father most recently advised his counselor that he is using marijuana on a daily basis – two to three grams per day – to cope with his ADHD symptoms. However, Father has not voluntarily done anything to address his positive screen in March, 2023, nor has he admitted to the Court that he was even smoking marijuana. Father originally represented to the Court that he had not used marijuana at all, and also told each evaluator that he had no history of marijuana or other drug use. At this time, whether Father has an ongoing chemical dependency that is untreatable is unknown, but the fact that he allowed his 2 year old daughter to ingest marijuana while he had her in his home certainly suggests an impairment.

The trial court did not explicitly find that Father had a chemical dependency that was untreatable, which is the standard to terminate parental rights. *See K.M.A.-B.*, 493 S.W.3d at 469.

Instead, the trial court findings indicate it had concerns regarding Father's marijuana use and his ability to parent Child.

Father focuses most of his argument on how recreational marijuana usage is legal in Missouri, and there was "no evidence that father's legal use of marijuana interferes with his ability to parent his child or poses a risk of danger to the child – admittedly other than the child tested positive for THC as to which there was no explanation for how this may have happened."

Father correctly cites *In re D.D.C.*, for the proposition that "drug use is not grounds for termination, nor is chemical dependency: rather, the statute provides grounds for termination for a chemical dependency 'which cannot be treated.'" *In re D.D.C.*, 351 S.W.3d 722, 730 (Mo. App. W.D. 2011). In *D.D.C.*, the Western District of this Court found that there was not clear, cogent, and convincing evidence of a chemical dependency that could not be treated because there was no "evidence of a service plan, a drug or alcohol assessment, a request or an attempt at treatment." *Id.* at 731. But the Court did find that Father's drug use rendered him unfit as a parent. *Id.* at 732.

However, Father's citation to *In Interest of K.M.A.-B.*, 493 S.W.3d 457 (Mo. App. E.D. 2016), is inapposite. In *K.M.A.-B.,* this Court found that:

> At all relevant times, Father maintained a job, had a suitable home ready for the child and consistently provided for the child's needs. It is undisputed that Father had consistently appropriate visits with the child, in which he fed, played with, talked to, disciplined when necessary and encouraged the child. Father was able to care for the child at those visits, even though he was also using marijuana during that time period outside of the child's presence.

*Id.* at 470. The facts of this case are easily distinguishable from *K.M.A.-B.* Here, Father did not maintain a job or a suitable home for Child, and did not consistently provide for Child's needs. Father's visits with Child did not result in a strong bond between Father and Child as Father was

16

disengaged. Finally, Father's marijuana use resulted in Child testing positive for the presence of marijuana. The facts of this case indicate a lack of an ability to care for Child, unlike in *K.M.A.-B.*

Although there is not substantial evidence that Father's chemical dependency is untreatable, as noted by the trial court, there are grave concerns about Father's marijuana use and his ability to care for Child. Similar to the mental condition factor, this factor need not support termination independently, but can be considered "along with all other relevant evidence in determining whether grounds for termination exist under Section 211.447.5(3)." *K.A.M.L.*, 644 S.W.3d at 23 (quoting *K.M.A.-B.*, 493 S.W.3d at 474).

In sum, there is clear, cogent, and convincing evidence supporting the trial court's findings that Father failed to fully comply with his service plan, and that despite the best efforts of the juvenile officer and the case manager, Father was not able to form a sustained change to be able to appropriately care for Child. Since evidence supporting one factor is sufficient to terminate parental rights, *K.A.M.L.*, 644 S.W.3d at 23, the trial court did not err in terminating Father's parental rights on the basis of Section 211.447.5(3) (failure to rectify).

Father's Point Two

In his second point, Father argues the trial court erred in terminating his parental rights in that there was insufficient evidence to support its finding and conclusions pursuant to Section 211.447.5(5) (parental unfitness).[5]

*Analysis*

Section 211.447.5(5)(a) provides:

---

[5] Though evidence supporting one factor is sufficient to terminate parental rights, we nevertheless address Father's point two due to the gravity of terminating parental rights.

The parent is unfit to be a party to the parent and child relationship because of a consistent pattern of committing a specific abuse including, but not limited to, specific conditions directly relating to the parent and child relationship which are determined by the court to be of a duration or nature that renders the parent unable for the reasonably foreseeable future to care appropriately for the ongoing physical, mental, or emotional needs of the child.

Further, it is presumed a parent is unfit if "at least fifteen of the twenty-two months prior to the filing of the petition, the child has been in foster care under the jurisdiction of the juvenile court." Section 211.447.5(5)(b)(e).

The trial court determined Father was unfit to parent on two bases. First, the trial court found that the Child was in foster care for twenty-eight months while the trial court had jurisdiction over the matter, therefore invoking the presumption. Second, the trial court cited "ongoing issues with providing care for their child" and "expos[ing] their toddler daughter to marijuana."

Father argues there was insufficient clear, cogent and convincing evidence to support this conclusion.[6] In support of his argument Father argues that the trial court based its findings on a lack of participation in court ordered services until the petition was filed, and the presumption for unfitness based upon Child's time in foster care.

We find, there is sufficient clear, cogent, and convincing evidence supporting the trial court's finding of unfitness. As an initial matter, by operation of Section 211.447.5(5)(b)(e), there is a presumption that Father is unfit because Child had been in foster care for greater than

---

[6] Father also seems to argue that the trial court did not make specific enough findings for appellate review. The claim of insufficient evidence and the specificity of the trial court's findings are distinct and separate claims. Appellant Father failed to raise the lack of specific findings argument in his point on appeal and thus it is waived and we do not consider it. *State ex rel. Nixon v. Worthy*, 247 S.W.3d 8, 13 (Mo. App. W.D. 2008).

fifteen of the twenty-two months prior to the filing of the petition.[7] *See generally Interest of Z.R.L.C.*, 700 S.W.3d 539, 542 (Mo. App. S.D. 2024) (this showing triggers "the rebuttable presumption of parental unfitness"). "The presumption of unfitness is rebuttable and can be overcome by evidence that . . . the parent is no longer unfit." *In re E.D.M.*, 126 S.W.3d 488, 495 (Mo. App. W.D. 2004) (quoting *In re A.H.*, 9 S.W.3d 56, 61 (Mo. App. W.D. 2000)). Father failed to rebut this presumption through his evidence presented. Father's witnesses had not interacted with Father in over a year prior to the hearing and had no current information about Father's parental fitness, as child was not present for visits.

In contrast, the juvenile officer presented clear, cogent, and convincing evidence that Father had failed to adequately care for the child through inadequate nutrition and feeding, maintaining an unsanitary home environment for Child, and was consistently using marijuana in the presence of Child, even though he fervently denied use and blamed others for the presence of marijuana. *See D.D.C.*, 351 S.W.3d at 732. Further evidence demonstrated it was unlikely that Father would be able to make a sufficient change to safely parent Child. Thus, sufficient evidence supports the finding that Father was unfit to parent Child and Father has failed to rebut the statutory presumption. *See E.D.M.*, 126 S.W.3d at 495-96.

Father's Point II is denied.

### Father's Point Three

In his third point, Father argues the trial court erred in finding that it was in the Child's best interests to terminate Father's parental rights pursuant to Section 211.447.7.

*Standard of Review*

---

[7] Child had been in foster care for twenty-eight months of the thirty-three months this case has been proceeding.

"In reviewing the trial court's best interest determination, our standard of review is abuse of discretion." *K.A.M.L.*, 644 S.W.3d at 25. "An abuse of discretion occurs only when the trial court's ruling is 'clearly against the logic of the circumstances and so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.'" *Id.* (quoting *Interest of D.L.P.*, 638 S.W.3d 82, 89 (Mo. App. E.D. 2021)).

*Analysis*

"Once grounds for termination of parental rights are identified, a trial court must then analyze the seven factors under § 211.447.7 and determine whether termination is in the child's 'best interest.'" *K.A.M.L.*, 644 S.W.3d at 25. "The 'best interest' determination is a subjective assessment based on the totality of the circumstances and is discretionary." *Id.* The seven factors courts evaluate in the "best interest" determination are:

(1) Emotional ties to the birth parent;
(2) The extent to which the parent has maintained regular visitation or other contact with the child;
(3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;
(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;
(5) The parent's disinterest in or lack of commitment to the child;
(6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;
(7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm.

*Id.* at 26 (citing Section 211.447.7). "There is no requirement, by statute or otherwise, that all seven of these factors must be negated before termination can take place." *Interest of N.D.P.H.*,

20

675 S.W.3d 777, 782 (Mo. App. S.D. 2023). "The presence of a single factor could support the determination of a child's best interest when it is reviewed in the totality of the circumstances, and that finding is a subjective assessment made by the trial court that is not reweighed by this Court." *Id.* (quoting *Interest of M.K.S.*, 612 S.W.3d 260, 262 (Mo. App. S.D. 2020)).

The trial court made findings on six factors when it found that it was in the best interest of Child for Father's parental rights to be terminated. The court first found that Child seemed to recognize Father, and appeared to behave as if she had some bond to him. Nonetheless, the trial court found that Child seemed to have a stronger bond with her grandfather, and preferred to interact with him during the visits. Finally, the trial court found that currently Child has no emotional ties to Father based upon the testimony of Child's foster mother.

Second, the trial court found that Father regularly visited Child, but was often disengaged in the visits, and appeared late and left early. The trial court noted that in the most recent visits, the case manager indicated that it was preferable that Child's grandfather came to the visits with Father because Father does not interact with Child at the visits.

Third, the trial court found that "neither parent has provided any form of monetary support for the child during the time she has been in the care of the Court. Neither parent provided food, clothing or other necessaries to the child while she was in alternative care."

Fourth, the trial court found that "the evidence adduced at trial indicated there are no additional services which would be likely to bring about any lasting parental adjustment to enable a return of the child to Mother or Father in the near future." The trial court noted that the case manager "put forth more effort in this case than in most cases to try and assist Father in reunifying with his child, to no avail." Further, the court found that neither the deputy juvenile

21

officer nor the case manager had "additional services to offer that they believed would allow for reunification between Child and either parent in the foreseeable future."

Fifth, the trial court found that "Father, rather than take proactive steps to address the issues that were raised by the Team, particularly after Child tested positive for marijuana, has shown a clear disinterest in her and a lack of a commitment outside of his own self-serving words." The court found that:

> Father's refusal to interact with his child at the majority of his visits since the termination of his second trial home placement speaks volumes as to his commitment to his daughter. Rather than use the time he has had to bond with and care for his child, he was disengaged during visits, and is only interested in participating in services when he believed he had to or it was court-ordered. Father had nearly a year to rehabilitate his situation after he exposed his daughter to drugs. Rather than take proactive steps to do so, he stopped working, stopped attending therapy and did nothing to address his issues with marijuana.

Sixth, the trial court found that "Father exposed Child to marijuana during the time he had her on his second trial home placement, and that he also neglected her medical care." The court concluded that "these acts were deliberate acts on Father's part. Acts for which he has taken no responsibility, or even admitted to any wrongdoing for. He subjected Child to a substantial risk of physical harm by allowing her access to his marijuana, and the Court has no assurances this would not happen in the future should Father have access to [Child] unsupervised."

Father's arguments challenging each finding simply ask this Court to reweigh the trial court's decision. This we will not do. *See N.D.P.H.*, 675 S.W.3d at 782. All six of the trial court's findings are fully supported by the record. And each factor indicates that it is in Child's best interest to terminate Father's parental rights.

22

The totality of the circumstances supports the finding that it is in Child's best interest to terminate Father's parental rights. The trial court did not abuse its discretion.

Father's Point III is denied.

## Father's Point Four

In his fourth point, Father argues the trial court erred when it denied his post-trial motion, which included a request to reopen the evidence and allow Father to testify.

### *Standard of Review*

We review a trial court's decision on whether to reopen evidence following the close of evidence for abuse of discretion. *Interest of T.M.L.*, 615 S.W.3d 100, 103 (Mo. App. E.D. 2020). "Ordinarily when there is no inconvenience to the court nor unfair advantage to one of the parties it would be an abuse of discretion to refuse to permit the introduction of material evidence which might substantially affect the merits of the case." *Id.* (quoting *In Interest of S---G.*, 779 S.W.2d 45, 54 (Mo. App. S.D. 1989)).

Father argues the trial court abused its discretion because "there was no inconvenience to the Court and there was not an unfair advantage to the juvenile officer to allow Father to testify. Had Father testified the juvenile officer, as well as the Court, would have been able to question Father." Father contends that the trial court's judgment even notes that Father's choice not to testify hindered the trial court's ability to make an informed judgment. But Father concedes that "he had an opportunity to testify and chose not to do so and is now asking this Court to allow him to change his mind and testify. He made a decision and did not like the outcome and now wants a chance to testify."

The trial court did not abuse its discretion in not allowing Father to reopen evidence. Father cites this Court's decision in *Interest of T.M.L.*, where this Court reversed the trial court's

termination of parental rights for the father. *Id.* at 103. In *T.M.L.*, the father was ill and unable to attend the hearing. *Id.* The father filed a motion to reopen evidence citing his illness and absence. *Id.* The trial court never explicitly ruled on the motion and entered judgment terminating the father's parental rights. *Id.* This Court reversed the termination of parental rights finding "there is no indication the trial court reviewed or considered the merits of the motion; it did not conduct a hearing or rule on the motion and instead entered its judgments terminating Father's parental rights approximately seven weeks after Father had filed the motion." *Id.* This Court concluded that "if the trial court had considered Father's motion to reopen the evidence and determined he was free of dereliction in failing to appear at the trial, there is nothing to suggest that reopening the evidence would have created an inconvenience to the trial court or given Father an unfair advantage." *Id.*

Here, the trial court heard arguments and reviewed Father's request to reopen evidence within his Motion to Vacate, Reopen, Correct, Amend or Modify the Judgment. The trial court denied the motion in its entirety. This is easily distinguishable from *T.M.L.*, where the trial court did not consider the motion. *Id.* Here, the trial court reviewed the motion and found it to be without merit.

Further, as Father concedes in his brief, Father had the opportunity to testify in the hearing, but chose not to. Father further concedes that he had made a decision and did not like the outcome and now wants a chance to testify. Effectively, Father is "dissatisfied with the original ruling and want[s] a second bite at the apple." *Dunn v. Hussman Corp.*, 892 S.W.2d 676, 680 (Mo. App. E.D. 1994). We cannot say the trial court abused its discretion in denying Father's motion.

Father's Point IV is denied.

We now address Mother points on appeal.

Mother's Point One

In her first point, Mother argues the trial court erred in terminating her parental rights in that there was insufficient evidence to support its finding and conclusions pursuant to Section 211.447.5(3) (failure to rectify).

As previously mentioned, "to terminate a party's parental rights, a trial court must: (1) find by 'clear, cogent, and convincing evidence' that one or more grounds for termination of parental rights exists, and (2) determine whether it is in the child's best interest to terminate a party's parental rights." *K.A.M.L.,* 644 S.W.3d at 22. The trial court found grounds existed for the termination of Mother's parental rights under section 211.447.5(3), failure to rectify, and 211.447.5(5), parental unfitness. "These are separate grounds for termination, and we will affirm the trial court's ruling if one is appropriate." *Id.* at 23. "If the trial court finds at least one statutory ground for termination exists, the court must then determine whether, by a preponderance of the evidence, the termination of parental rights is in the child's best interest." *Id.* (citing Section 211.447.7).

Applying the four factors enunciated in Section 211.447.5(3), the trial court found that Mother had failed to comply with the relevant portion of her service plan; the juvenile officer and the Children's Division had made efforts to reunify Mother and Child, but those efforts did not successfully aid the parent on a continuing basis in adjusting her circumstances or conduct to provide a proper home for the child; and a mental condition, shown by competent evidence to be permanent, renders Mother unable to knowingly provide the child the necessary care, custody, and control. The court, however, found no evidence of Mother having a chemical dependency.

(a) Social Service Plan Compliance

The trial court found that Mother had failed to comply with the relevant portion of her service plan, parent education and/or support services. Specifically, the trial court noted that "Mother indicated from the onset of the case through the date of trial that Mother did not wish to reunify with her daughter, and in fact had indicated that she wanted the child to be with Father and/or another relative. Mother did not avail herself of any services throughout the life of the case, and had only visited the child two times in the year prior to the trial in this matter." Further, "Mother resided with Father on and off again throughout the time [Child] was in care, and relied upon him for her support. The credible evidence is that Mother is not willing or able to parent the child at this time, and has shown no interest in doing so throughout the duration of this case." This was supported by substantial evidence in the record.

Mother was also ordered to participate in services but did not. The only exception to her lack of participation was initially when she lived with Father and participated in training with the parent aides during their visits to Father's home.

In the Children's Division's court report in September 2021, they noted that Mother had indicated her desire for Father to have full custody. At the time of the trial court's case review hearing in November 2021, Mother was non-compliant as to both an ordered psychological evaluation and an ordered parenting class. Additionally, Mother continued to indicate to the court that she wanted Father to have full custody of the child, and that she did not wish to work her service plan, get referrals for services, or reunify with the baby. Mother's position continued through her case review hearings until her permanency review hearing in May 2023, when the juvenile officer recommended proceeding to terminating her parental rights. Thus, there was substantial evidence that Mother was not willing and had failed to comply with the relevant portion of her service plan.

## (b) Agency Efforts

The court found that the Children's Division made reasonable efforts over three years to reunify Child with Mother however those efforts were never met with any desire or willingness on Mother's part to parent the child. The court explained that the case manager and the Children's Division's efforts were unsuccessful because Mother failed to follow through with getting engaged in or enrolled in services – specifically those services most relevant to this situation including psychological services and parent education. There is substantial evidence to support this finding as well.

As noted above, Mother was noncompliant with court ordered services, all of which were intended to help the Children's Division reunify Mother with Child. Mother continued to express that she did not want to work her service plan, get referrals for services, or reunify with Child.

At the termination hearing, there was testimony that even during the services Mother did participate in during the visits to Father's home, agency efforts did not produce any changes in her behavior. The case worker observed Mother on multiple occasions feeding Child from a jar of baby food that had been left open and unrefrigerated for days with a dirty spoon despite case workers efforts to correct the behavior. Thus, substantial evidence supports the trial court's finding.

## (c) Mental Condition

The court had evidence before it that Mother was diagnosed with Intellectual Developmental Disorder and was on disability for that disorder. The witnesses who had interacted with Mother indicated she was mostly non-verbal. Both the case worker and juvenile officer, during their limited interactions with Mother at home visits, testified that she did not appear to understand the child's situation or understand instructions.

Hospital records from Child's birth also demonstrate Mother's cognitive delay and her inability to understand and care for Child. Records further indicate both "parents' lack of understanding of infant's signs of stress during feeding."

At the termination of parental rights hearing, Mother's guardian ad litem was present and when asked by the court whether her client was able to comprehend the proceedings she answered "No" because she did "not believe that [her] client underst[ood] the nature of the proceedings." Moreover, she did not believe that Mother would even "be capable of . . . testifying or understanding the questions that would be asked of her." Given Mother's situation, she did not believe Mother could safely parent Child.

There was no evidence in the record that Mother's condition is reversible, and therefore at this time she is unable to knowingly provide the child with the necessary care, custody and control. There was also no evidence that any other services that could be offered would be successful in allowing Mother to reunify given her lack of a desire to do so, and her lack of a capacity to want to do so. Thus, there was substantial evidence that Mother had a mental condition shown by competent evidence to be permanent which renders Mother unable to knowingly provide Child the necessary care, custody, and control.

### (d) Chemical Dependency

Though there were no signs of chemical dependency in Mother, there is substantial evidence of the three other grounds for terminating Mother's parental rights under Section 211.447.5(3) (failure to rectify).

The court only needed to find support for one ground by a preponderance of the evidence to terminate Mother's parental rights. *K.A.M.L.,* 644 S.W.3d at 22 (citing Section 211.447.7). The trial court did not err in terminating Mother's parental rights.

28

Mother's Point I is denied.

## Mother's Point Two

In her second point, Mother argues the trial court erred in terminating her parental rights in that there was insufficient evidence to support its finding and conclusions pursuant to Section 211.447.5(5) (parental unfitness).[8]

*Analysis*

As previously stated, Section 211.447.5(5)(a) allows for the termination of parental rights if the parent is deemed unfit demonstrated by "specific conditions directly relating to the parent and child relationship which are determined by the court to be of a duration or nature that renders the parent unable for the reasonably foreseeable future to care appropriately for the ongoing physical, mental, or emotional needs of the child." A parent is presumed unfit when "at least fifteen of the twenty-two months prior to the filing of the petition, the child has been in foster care under the jurisdiction of the juvenile court." Section 211.447.5(5)(b)(e).

The trial court found Mother unfit based upon the presumption and the "ongoing issues with providing care for their child." Sufficient cogent, clear, and convincing evidence supported the trial court's findings. Evidence at trial demonstrated Child had been in foster care for twenty-eight months of the thirty-three months this case has been proceeding. This raises a rebuttable presumption of parental unfitness. *Z.R.L.C.*, 700 S.W.3d at 542. Other evidence demonstrated that Mother could not be considered an appropriate caregiver for Child or that Mother had the ability to care and safely provide for the child. Mother had no desire to participate in any sort of services to assist with her care of Child. Mother also indicated she did not want to be reunified

---

[8] Though evidence supporting one factor is sufficient to terminate parental rights, we nevertheless address Mother's point two due to the gravity of terminating parental rights.

29

with Child. Also, Mother's cognitive condition and intellectual disability necessitated that any visits between Mother and Child be supervised. It would not have been appropriate for Mother to care for Child alone.

Throughout trial Mother did not testify and failed to provide sufficient evidence to rebut the presumption of unfitness.

Mother's Point II is denied.

## Mother's Point Three

In her third point, Mother argues the trial court erred in finding that it was in the Child's best interests to terminate Mother's parental rights pursuant to Section 211.447.7.

### *Standard of Review*

As previously stated, we review the trial court's best interest determination for abuse of discretion. *K.A.M.L.*, 644 S.W.3d at 25. "An abuse of discretion occurs only when the trial court's ruling is 'clearly against the logic of the circumstances and so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.'" *Id.* (quoting *D.L.P.*, 638 S.W.3d at 89).

### *Analysis*

The trial court, in applying the seven best interest factors, pursuant to Section 211.447.7, found that first, Mother had no parent-child bond with Child. The trial court found that Mother had very limited contact with Child, thus any emotional ties Child would have with Mother were not present. Second, the trial court found that Mother had not visited Child on any regular or consistent basis. Third, the trial court found that "neither parent has provided any form of monetary support for the child during the time she has been in the care of the Court. Neither parent provided food, clothing or other necessaries to the child while she was in alternative

30

care." Fourth, the trial court found that "the evidence adduced at trial indicated there are no additional services which would be likely to bring about any lasting parental adjustment to enable a return of the child to Mother or Father in the near future." Fifth, the trial court found that Mother had demonstrated a lack of commitment to the child, reasoning that Mother's unwillingness to engage may be due to her cognitive issues.

Mother challenges each finding without citation to facts in the record or to the law. For example, Mother states she disagrees with the trial court's findings that Mother has no emotional ties to the child. The evidence at trial indicated that Mother had no interest in keeping Child, and instead wanted to give Child to another family member. Further evidence demonstrated that aside from the two trial home placements, and within the first three weeks of Child's life, Mother had no contact with Child. "A lack of bonding is substantial evidence supporting that termination is in the best interest of the child, particularly when taken in conjunction with other factors supporting termination." *In re C.A.M.*, 282 S.W.3d 398, 408 (Mo. App. S.D. 2009). The trial court need not speculate as to the amount of time needed to establish a parent-child bond, if a bond can be established at all, because the evidence at trial demonstrated Mother's lack of interest in the child and Mother's failure to comply with her service plan for reunification. *See In re J.D.P.*, 406 S.W.3d 81, 85 (Mo. App. E.D. 2013).

In addition to the first and second factors, the rest of Mother's arguments focus on reweighing the evidence and the trial court's decision. This runs afoul of our standard of review. *See N.D.P.H.*, 675 S.W.3d at 782. We are required to view the evidence "in the light most favorable to the trial court's judgment." *K.A.M.L.*, 644 S.W.3d at 20. Viewing the remainder of the evidence presented at trial in a light most favorable to the trial court's judgment, the trial court's findings are well supported by the record.

31

Viewing the totality of the circumstances, the trial court's findings that it was in Child's best interest to terminate Mother's parental rights was not an abuse of discretion.

Mother's Point III is denied.

### Mother's Point Four

In her fourth point, Mother argues the trial court erred when it denied Father's post-trial motion, which included a request to reopen the evidence and allow Mother and Father to testify.

*Preservation*

Respondent argues Mother failed to preserve this issue because Mother failed to file a post-trial motion for new trial that alleged this as error. Respondent also reasons that "Father's Motion did not request Mother be allowed to testify if the evidence was re-opened."

Rule 78.07 provides that in a cases tried without a jury "neither a motion for a new trial nor a motion to amend the judgment or opinion is necessary to preserve any matter for appellate review if the matter was previously presented to the trial court."[9] Mother did not file a motion for new trial and did not present this alleged error to the trial court. Thus, Mother failed to preserve this issue for appeal. *See Ferkel v. Ferkel*, 434 S.W.3d 108, 109 (Mo. App. E.D. 2014). "Although we may review an unpreserved claim for plain error, we rarely review for plain error in civil cases." *Id.* at 110 (quoting *Bowman v. Prinster*, 384 S.W.3d 365, 372 (Mo. App. E.D.2012)).

We decline to review for plain error.[10]

---

[9] All Rule references are to the Missouri Supreme Court Rules (2023), unless otherwise indicated.

[10] Mother also likely lacks standing to bring this point on appeal. *See In Interest of D.J.*, 555 S.W.3d 490, 491-92 (Mo. App. S.D. 2018) (finding no standing for a mother to present arguments on a father's behalf in an appeal of the termination of her parental rights). Mother was not aggrieved by the trial court's order denying Father's Motion to Vacate the Judgment and Mother cannot raise claims on Father's behalf. *See id.*

Mother's Point IV is denied.

## Conclusion

We affirm the judgment of the trial court.


_____
Angela T. Quigless, J.

James M. Dowd, P.J., and
John P. Torbitzky, J., concur.